EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,

v.

SOUTHWESTERN ELECTRIC POWER COMPANY, Defendant.

Civ. No. 82–2234.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

July 19, 1984.

David L. Slate, Gen. Counsel, Michael A. Middleton, Associate Gen. Counsel, E.E. O.C., Washington, D.C., Terrel J. Broussard, Acting Regional Atty., Christopher L. Williams, Supervisory Trial Atty., Clement P. Donelon, Senior Trial Atty., E.E.O.C., New Orleans District Office, New Orleans, La. for plaintiff.

Arthur R. Carmody, Jr., Wilkinson & Carmody, Lawrence W. Pettiette, Jr., Wilkinson & Carmody, Shreveport, La., Leonard Greenhaw, Greenhaw & Greenhaw, Fayetteville, Ark., for defendant.

## MEMORANDUM OPINION

### H. FRANKLIN WATERS, Chief Judge.

This is a case in which the plaintiff, Equal Employment Opportunity Commission, claims that defendant discriminated against Judith Miller, a former employee of defendant, by reason of her sex. The case is brought pursuant to the provisions of section 706 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–5). The court has jurisdiction of the matter by reason of the provisions of that Act and 28 U.S.C. §§ 1337 and 1343.

The case was tried to the court on December 16 and 17, and, because of the conflict in the schedule of the attorneys and the court, was not completed until May 3 and 4, 1984. At the close of the evidence, the court asked that the parties file proposed findings of fact and conclusions of law. These have been received, and the court is prepared to rule. The findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure will be separately stated in this opinion.

### DISCUSSION AND FINDINGS OF FACT

Southwestern Electric Power Company (SWEPCO) is an electric public utility company which serves approximately 350,000 customers in Western Arkansas, East Texas, and Northwest Louisiana, and has several offices and other business establishments in the Western District of Arkansas, including an office at Greenwood. SWEPCO has continuously, since before January of 1980, and does now employ more than fifteen persons and is and was at such time in an industry affecting commerce.

It is undisputed that Judith Miller, for whom this action was brought by EEOC, was hired by Southwestern Electric Power Company (SWEPCO) on May 30, 1972. She was initially hired as a junior clerk, and promoted to the position of clerk on May 16, 1975, with her job duties remaining essentially the same.

Mrs. Miller was employed at defendant's Greenwood, Arkansas, office, which is responsible for servicing a town of some 2,000 persons. The entire staff consists of the manager, Buford Hand, an outside troubleman, and two clerks, including Mrs. Miller.

The parties are substantially in agreement as to the duties of Mrs. Miller at the Greenwood office. Mr. Hand testified that her job was primarily a sedentary one, with it being necessary for her to leave her desk infrequently to pull a file from a file cabinet. She would also leave her desk to go to the counter to accept a payment from a customer. According to Mr. Hand, her job required no lifting. He says that when she was "caught up" she could read a book or knit, which she frequently did. Mrs. Miller's testimony in this regard is not substantially different. She said that she took complaints, typed, filed, answered the telephone, and occasionally was required to get a meter base weighing, she would guess, from five to fifteen pounds, and hand it to another employee.

On January 21, 1980, Mrs. Miller gave birth to her second child. Everyone concerned agrees that it was an uncomplicated pregnancy and delivery, and that her recovery was, in no degree, unusual or that any complications developed during her recovery.

Both before and after her delivery, Mrs. Miller was advised by the manager that she would receive full pay for a four-week period after the delivery and that the employer

would consider an extension of that time if there was medical evidence that there was a reason for it. She was told that if there was not a medical reason for her to remain off work after such four-week period, she would be expected to return to work.

According to the testimony of Cecil Warren, an EEOC Intake Officer, on February 8, 1980, long before the four-week period had expired, and before she could have possibly known what her medical condition would be at the time of her expected return, Mrs. Miller called him and asked about her rights under the sex discrimination law in relation to pregnancies. She was told by Mr. Warren that her employer must treat her pregnancy as any other illness. This testimony, along with other testimony in this case, causes the court to believe that Mrs. Miller had decided at or before the time of her delivery that she did not intend to return to work at the end of the four-week period irrespective of what her medical condition was at that time, and that she expected to be off work with full pay for a six-week period.

Apparently in an attempt to provide to the employer a medical reason for her to remain with her child for a period of six weeks after delivery, she obtained three letters from her delivering physician, Dr. R.D. McKinney of Greenwood, a family physician (not an obstetrician). In a letter dated January 31, 1980 (Exhibit 7A), the doctor simply stated that he would "prefer that she not return to work until after her six weeks' checkup." Then, by letter dated February 12, 1980 (Exhibit 7C), the doctor stated, in what the court believes to be rather equivocal terms, that he did not think Mrs. Miller should return to work until six weeks after delivery. The only reason given by him for this opinion was that she should not return to work before recovering her strength completely and before her perineum was completely healed. He went on to say that he also thought it was good for the patient to have time to "get to know her infant."

It is noteworthy that Dr. McKinney did not say that she could not return to work because of medical reasons. Instead, he goes on to say, in the February 12 letter: "I doubt if any serious problem would develop if she returned to work before this time, but I feel like her physical and emotional health would be better served if she didn't return to work until six weeks post delivery." During Mrs. Miller's testimony, she was asked if she had not asked the doctor for the last letter when she discovered that the first two were not going to get her an extension, and she agreed that she did and admitted that the doctor indicated that the last letter was about as helpful as he could be in respect to attempting to obtain an extension of time for her to return to work.

Dr. McKinney testified at the trial and stated that it was his policy to recommend that women not return to work for a period of six weeks after delivery. He indicated rather briskly that he did not believe employers should question his opinion in that regard. He admitted that he did not know what Mrs. Miller's duties on the job were nor did he seem to care. He said, in answer to the court's question, that he uses the six-week rule irrespective of what the patient's condition is or what job she performs. On cross-examination, he either could not or would not answer defendant's attorney's question whether he believed that "a healthy woman with a normal delivery should be able to return to work at the end of a four-week recovery period."

After receiving Dr. McKinney's letter discussed above, and after Mrs. Miller's refusal to return to work as directed on February 18, 1980, her employment was terminated by SWEPCO.

The evidence shows that SWEPCO has what the court believes to be a liberal "sick time" policy which is exceptionally favorable to the employee. All employees, male or female, are given a reasonable amount of time off at full pay for illness or injury. Each illness or injury is evaluated on an individual basis. When there is a good medical reason for an employee to be off work, the employee receives full pay for a maximum of five calendar months. During

this period, the employee's immediate supervisor is authorized to approve sick time off for a period of two consecutive weeks. Thereafter, the employee's division manager or department head must approve sick time of more than two weeks but less than six weeks. Only the company president can authorize sick time of more than six weeks. After the five calendar month period, the employee goes off the active payroll and comes under the disability program. As part of the policy, SWEPCO expects an employee to return to work on a light duty basis and is expected at that time to do only those duties which the employee is medically capable of performing.

Since shortly after the passage by Congress of the Pregnancy Discrimination Act in 1978, which became effective April 29, 1979, it has been SWEPCO's policy to treat pregnancies like any other illness. In a letter dated March 6, 1979 (Exhibit 9), Lamar Stall, then president of the company, in a memorandum directed to the "entire company," advised that the length of time off for pregnancy will be authorized "as in the case of any other illness." He stated that each maternity case would be "evaluated on an individual basis using the same methods followed in the administration of current sick pay plan."

The sick time policy of SWEPCO seems to be somewhat less formal than that of many companies its size, but is further delineated in Exhibits 4, 5 and 10, and it is abundantly clear from these exhibits that it was at least SWEPCO's announced policy that it would treat maternity leave the same as it treats leaves for any other illness. These exhibits show that at least since April of 1979, employees who have an illness, including pregnancies, will be treated on an individual basis and the employer allows the employee to remain off work, at full pay, for a period not to exceed five months, so long as there are valid medical reasons for such absence.

Not only does the SWEPCO written policy provide that cases are to be evaluated on a nondiscriminatory case-by-case basis, the evidence shows that SWEPCO's policy was to do so. Management personnel had a great deal of discretion to determine the period that an employee could be off work at full pay and, where necessary or thought to be advisable by the supervising personnel, doctor statements or other medical evidence was utilized. This was true, not only in the case of pregnancies, but in the case of other illnesses or disabilities as well. As exemplified by Exhibit 10, supervisors were instructed that doctors' statements clearing an employee for work ordinarily were not required, but that such supervisors should require proof that time off was needed before granting same. This applied, as Exhibit 10 shows, not only in pregnancy cases, but also "as in other disability cases." (Ex. 10, para. 2b.)

The court was "treated" to a great deal of medical testimony on the question of the "proper" recuperative period after a normal delivery, and the court has apparently been invited to make a determination of this question. For the reasons set forth below, the court will decline to do so, because it finds that it is not necessary in order to reach a decision in this case. Suffice it to say that medical testimony ranges from that of Dr. George Cole, an eminently qualified obstetrician-gynecologist of Fayetteville, Arkansas, a college town, with a substantial practice in the college community, who testified that he allows his patients to work until they go into labor, and that most of his student patients return to school within a week after delivery, to that of Dr. McKinney, who says that he recommends that his patients remain off work for six weeks, regardless of their condition and the duties of their employment. In this respect, three of the doctors who testified, Dr. Cole and Drs. Charles Nash and James H. Eddy, Jr., of Shreveport, Louisiana, testified that a woman should be able to return to work after a normal delivery in not more than four weeks after delivery without any hazard to themselves. These three physicians also testified that they had reviewed Mrs. Miller's file which indicated that her delivery was normal, and that there was no medical reason why she could

not return to work when directed by SWEPCO.

On the other hand, in addition to Dr. McKinney, Dr. Miguel Beruman of Cooper Clinic in Fort Smith, Dr. John D. Hoffman of Fort Smith, and Dr. William Harrison of Fayetteville, testified in behalf of the plaintiff that they recommend that their patients not return to work until after their six-week checkup. However, as noted above, Dr. McKinney indicated that that was his policy in every case and did not, either in the report submitted by Mrs. Miller to the company, or in his testimony, state that he believed that there were medical reasons why Mrs. Miller could not return to work four weeks after delivery. In fact, in his February 12, 1980, letter, he states that he doubts "if any serious problem would develop if she returned to work before this time." Likewise, while Drs. Beruman, Hoffman and Harrison testified that they still follow the policy of recommending a six-week recuperative period, none of them testified that any physical harm could be expected in allowing a patient to return to work four weeks after delivery. In fact, Dr. Beruman testified that it is his opinion that SWEPCO's four-week sick leave policy is not unreasonable if it provides for "a checkup and OK." Dr. Beruman was asked in substance (not verbatim): "Assume four weeks after delivery the patient says 'I do sedentary work and can get light duty and my employer has guidelines saying that I should return to work four weeks after delivery' and you checked her over and found her OK. Under those circumstances, there is no reason that you could not write her an OK is there?" The doctor replied: "Assuming her examination is normal, no sir." Likewise, Dr. William Harrison, during cross-examination, agreed that he knew nothing about SWEPCO's benefit policy, or Mrs. Miller's delivery, and, assuming a normal delivery, he had "no problem" with SWEPCO's policy requiring a return to work at light duty four weeks after delivery. He testified on redirect examination that he thinks most mothers could go back to work at light duty at four weeks after delivery, but believes it is not in the best interest of all mothers or all children to require it.

In short, the medical testimony seems to indicate that, in the past, it was the custom of physicians to recommend that their patients not return to work until six weeks after delivery, and that some physicians continue to follow this practice, although not based upon much, if any, medical evidence. It may very well be, as Drs. McKinney and Harrison seem to believe, that the child and mother are better served with a longer recuperative period; however, their testimony does not indicate that this is due to medical problems caused to the mother by a normal delivery. As Dr. McKinney says, a longer period gives the mother and child a better opportunity to become acquainted, to the benefit of all. There are many who still believe that it is best for the family for mothers of young children not to work at all, but that does not appear to be based on medical reasons.

Be that as it may, the court does not believe that it is its "job" in this case to determine how long it takes to recover from having a baby. Instead, the court must view the evidence in the case and determine whether SWEPCO's sick time policy, and the administration of it, results in sex discrimination, violative of the Civil Rights Act of 1964, as amended.

The United States Supreme Court has rather clearly set forth the burden of proof requirement in a case such as this one. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Court described the burden as follows:

1. Plaintiff must establish a prima facie case of sex discrimination by meeting the test set forth in these cases;

2. The burden then shifts to the defendant to clearly explain or articulate the legitimate, nondiscriminatory reason for its action;

3. The burden is then on the plaintiff to show that defendant's stated reason

is pretextual in nature and that the employer's proper explanation is unworthy of credence.

The court finds in this case that plaintiff has failed to meet her initial burden of making a prima facie case of sex discrimination. Even if she had met that burden, the court finds that, after considering all of the evidence, plaintiff has not succeeded in convincing the court that, more likely than not, the sick time policy of SWEPCO was designed or administered in such a manner as to constitute unequal treatment of Mrs. Miller because of her sex.

As indicated above, Exhibits 4, 5, 9 and 10 set forth, in somewhat informal fashion, the sick leave policy of SWEPCO, and it is apparent from a mere reading of these documents that the policy does not, at least on its face, constitute sex discrimination. These documents indicate, more than once, that SWEPCO personnel are to treat maternity leave just as they treat sick leave for any other illness. This is true because these documents say that more than once. They indicate that all illnesses, including pregnancies, are to be treated on an individual basis, and that an employee will receive full pay for a period not to exceed five months so long as there is satisfactory medical evidence presented to show that it is necessary for the employee to be off work. That is true whether the illness is a pregnancy, a heart attack, cancer, a common cold, or any other illness, severe or otherwise. Each is considered individually, and the employee must furnish company personnel with adequate medical proof that his or her absence is dictated by medical or health reasons. Surely that is not discriminatory and surely there is a good business reason for such a requirement. There is absolutely no evidence in the record that indicates that this is a policy that applies only to pregnancies. Since this is the case, Title VII of the Civil Rights Act of 1964, as amended, does not "outlaw" a liberal sick leave policy such as SWEPCO's simply because each sickness is treated on an individual basis, and the company personnel responsible for making determinations on these questions have a great deal of latitude in determining what medical evidence will be considered to be sufficient, unless there is a showing that the plan is administered in such a manner as to discriminate against persons because of their sex. Thus, the court finds that SWEPCO's sick leave policy, at least "as written," does not violate Title VII of the Civil Rights Act of 1964, as amended.

That determination leaves the question of whether the plan was administered in this instance in such a manner as to constitute discrimination against Mrs. Miller because of her sex. The court finds that there is absolutely a dearth of testimony and evidence which indicates that this is the case. The court believes that the evidence indicates that Mrs. Miller decided before her baby was delivered that she did not intend to return to work for six weeks after delivery, irrespective of SWEPCO's policy which was clearly known to her. While a citizen certainly has a right to inquire of governmental agencies about their rights under the law, the fact that she inquired at the EEOC office about this matter on February 8, 1980, several days before the four-week period allowed by SWEPCO had expired, and four days before Dr. McKinney's final letter of February 12, 1980, indicates to the court that she did not intend to return to work and that Dr. McKinney's letters were written at her request in an attempt to gain her an additional two weeks of sick leave at full pay. She admitted during her testimony that she knew of no reason why she could not do her job four weeks after delivery, but says that she was simply following the doctor's recommendation. While that is true in a sense, it is clear from the evidence that that recommendation had no medical basis and was given by Dr. McKinney, after being asked to do so, simply because that is the recommendation that he makes in all cases without taking into account to any degree the health of the patient or the job that she is expected to do. He says that he doubts that any serious problem would develop if she returned to work in four weeks, but, in effect, that he would prefer

that she did not. He seems to believe that the employer does not have a right to question his recommendation.

In short, there is absolutely no evidence in this record which even tends to show that there was any medical reason for Mrs. Miller not to return to her employment at light duty four weeks after delivery. Likewise, there is no evidence in the record which indicates that Mrs. Miller and her "illness" was treated in any manner differently than the illness of any other individual, nor that the company sick leave policy discriminated against women because of their sex. To the contrary, the evidence indicates that the company truly treated each illness on an individual basis, granting ample sick time leave where medical conditions and medical evidence warranted.

Lisa Stevens, a female employee of SWEPCO at the Fayetteville office, testified that she delivered twins and because of medical complications, and after furnishing evidence of it, she was allowed to remain off work at full pay two weeks before delivery. One of the children died, and the other had complicated heart surgery in Oklahoma City. She returned to work four weeks after delivery and was granted an additional week because of the trauma associated with the death. Then, in 1981, she delivered another child in an uncomplicated delivery, and returned to work at the end of four weeks. In both instances, she was allowed to work "at her own pace" in a light duty capacity until she was able to resume full duties.

Janet Oxford, also a SWEPCO employee, delivered a child in late 1981, and returned to work four weeks after delivery, on light duty. Both she and Mrs. Stevens testified that they saw no indications that they were treated any differently than men with temporary disabilities.

There is simply no evidence from which this court could determine that it is more likely than not that Mrs. Miller was treated differently than male employees because of her sex, nor that other female employees are discriminated against by SWEPCO's sick time leave policy after a pregnancy and child delivery.

Plaintiff cites "interpretive guidelines" promulgated by the commission after passage of the Pregnancy Discrimination Act, 44 Fed.Reg. 23,804–23,809 (Apr. 20, 1979), and *Newport News Shipbuilding and Dry Dock Company v. E.E.O.C.*, 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983), 51 U.S.L.W. 4837 (1983), and seems to contend that the court should consider these guidelines and determine that, because of their content, there was discrimination in this case. In the first place, as the court reads those guidelines, all that they say is that benefits should be provided for a pregnancy-related disability for as long as the employee is unable to return to work for medical reasons, unless there is a limitation for all other temporary disabilities. The other guideline cited by EEOC simply says that "if an employer allows his employees to obtain doctors' statements from their personal physicians for absences and return dates due to other disabilities, it must accept doctors' statements from personal physicians for absences and return dates connected with pregnancy-related disabilities." The court finds that not only was the law not violated by SWEPCO's sick leave policy or the administration of it, neither are the interpretive guidelines of the EEOC. An employee is given benefits for a pregnancy-related disability for exactly the same period of time and in exactly the same manner as are employees with other temporary disabilities. Likewise, the evidence is clear that the employer uses doctors' statements in relation to pregnancy-related disabilities in exactly the same manner as they are used in other temporary disabilities. In any event, even if these guidelines, as written, say that SWEPCO's policy is discriminatory, they clearly are "not the law." *See, e.g., E.E.O.C. v. Emerson Elec. Co.*, 539 F.Supp. 153 (E.D.Mo.1982), and *E.E.O.C. v. Group Hospital Service, Inc.*, 539 F.Supp. 185 (N.D. Tex.1982).

The court finds that, in spite of Mrs. Miller's knowledge about the sick time policy of SWEPCO and her knowledge that she

would be allowed to return to work on a light duty basis, performing only those job duties that she was able to perform, and in spite of the fact that she was not able to furnish to the company a medical reason for an extension of her recuperative period, Mrs. Miller refused to return to work when directed, and in response to this refusal, the company, in the court's view, properly terminated her employment.

There was certainly no medical reason in Mrs. Miller's case for her to remain off the job, at full pay, for an additional two-week period. This is evidenced by not only the fact that Dr. McKinney could not or did not give a medical reason for the two-week extension, but also by the testimony of Drs. George Cole, Charles Nash and James Eddy, Jr., that they had reviewed Mrs. Miller's records and could find no reason for an extended disability.

The court specifically finds that SWEPCO, at the time of Mrs. Miller's termination and at the present time, treats maternity as any other temporary disability and that it administers its sick time policy in a fair and even-handed manner without discrimination against any individual because of that individual's sex. Defendant treated Judith Miller in the same manner as any other employee in similar circumstances with a temporary disability. The court finds that Judith Miller was well aware of defendant's sick leave policy and willfully and with full knowledge of the possible consequences violated this company policy by failing to return to work or to submit legitimate personal or medical information which would allow the company to consider her request for additional time off from work.

The court further finds that SWEPCO's policy of evaluating an employee's medical condition a reasonable time after the temporary disability begins (four weeks in the case of pregnancy) and requiring the employee to furnish medical proof if additional time off from work at full pay is needed is applied not only to pregnancy cases but to other types of temporary disability cases as well, and that such policy is a reasonable and legitimate business decision predicated upon adequate and persuasive medical and physiological authority, and that such policy was fair and even-handed in its application.

## CONCLUSIONS OF LAW

1. The Equal Employment Opportunity Commission filed this action under the provisions of 42 U.S.C. § 2000e–5(f)(1). The court finds that the commission satisfied all procedural conditions precedent to the institution of this suit and that both jurisdiction and venue provisions have been met, and that this court has jurisdiction of the parties and subject matter.

2. The plaintiff has not met her burden of establishing a prima facie case of sex discrimination in that she has not met the tests set forth in cases such as *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The court further finds that, even if such tests had been met, the defendant has come forward with reasons for its action, which reasons the court finds were not pretextual and that such explanation is worthy of credence. *McDonnell Douglas, supra,* and *Texas Dept. of Community Affairs, supra.* In this regard, the court specifically finds that the plaintiff has not succeeded in convincing the court that, more likely than not, the defendant treated her in a manner differently than male employees are treated and that it discriminated against her for the reason that she is a woman.

3. For the reasons set forth above, the court concludes that SWEPCO's sick time policy more particularly described hereinbefore does not violate sections 701(k) or 703 of Title VII of the Civil Rights Act of 1964, as amended, or any other relevant federal law and that, for such reason, the plaintiff should take nothing on its complaint filed herein and that it should be and hereby is dismissed with prejudice.

A separate judgment will be entered contemporaneously herewith.