**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ACKERMAN, HOOD & MCQUEEN, INC., Defendant.**

No. CIV–90–727–P.

United States District Court,
W.D. Oklahoma.

Feb. 20, 1991.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILLIPS, District Judge.

## I. BACKGROUND

### A. *Summary of Facts and Ruling*

In January 1986, Phyllis Kay Torbeck, a secretary, learned that she was pregnant and announced this fact to her coworkers. Torbeck was working in the secretarial pool of the Oklahoma City office of Ackerman, Hood & McQueen ("AHM"), an advertising and public relations firm. Prior to her pregnancy, Torbeck had never been disciplined at AHM, and her personnel file contained no indication of adverse comments or counseling sessions. As a pregnant employee at AHM, Torbeck would have been eligible to take six weeks of paid maternity leave at the time she gave birth to her child.

On January 14, 1986, four days after Torbeck's pregnancy test, the chairman of AHM "counseled" Torbeck about her alleged unwillingness to work overtime, including time in the evenings and on Saturdays and Sundays. The AHM officer, Raymond B. Ackerman, wrote in a memorandum after the session that he had reminded Torbeck that a condition of her employment required her to be available "on any evening or any day of the weekend requested."

Three months after the counseling session, AHM fired Torbeck. Torbeck had been experiencing some of the physical symptoms of a typical pregnancy—fatigue, headaches, and lower back pain. At her request, Torbeck's obstetrician sent a letter to AHM that recommended that she work no more than 40 hours a week; the doctor also noted in the letter that Torbeck was in "good health." AHM discharged Torbeck on April 3, 1986, the day after she submitted her doctor's letter. AHM's position essentially was that Torbeck was fired for insubordination because she intended to follow her doctor's recommendation and not work overtime, despite the fact she was in good health.

Tela L. Gatewood, Supervisory Trial Atty., and Nancy Dean Edmonds, Trial Atty., Dallas, for plaintiff.

Stephen P. Friot and Barbara L. Swimley, Spradling, Alpern, Friot & Gum, Oklahoma City, for defendant.

In this discriminatory discharge action, the Equal Employment Opportunity Commission ("the EEOC") alleged that AHM fired Torbeck in violation of the provisions of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), including the Pregnancy Discrimination Act of 1978. The EEOC argued that because she was pregnant AHM treated Torbeck's request to reduce her working hours differently than similar requests made by other employees. In response, AHM insisted that Torbeck had refused to work overtime and had not presented the company with valid medical evidence to support her request to work fewer hours.[1]

The Court has concluded that Torbeck would not have been fired had she not been pregnant. AHM treated her request for a schedule adjustment differently than the firm handled other similarly situated employees' requests. The evidence shows that AHM liberally granted leaves and work schedule adjustments to other employees for medical and other reasons under an unwritten policy. In considering Torbeck's request, AHM applied a higher standard; the firm justified her firing by insisting that she had failed to provide sufficient evidence of medical need.

## B. *Trial Procedure and Attorneys*

Using an affidavit procedure,[2] the Court heard testimony in the bench trial on January 3 and 4, 1991.

All counsel were extremely well prepared and represented their clients with the highest degree of professionalism. Tela L. Gatewood, supervisory trial attorney, and Nancy Dean Edmonds, trial attorney, both of the EEOC office in Dallas, represented the EEOC. Stephen P. Friot and Barbara L. Swimley, of the law firm Spradling, Alpern, Friot & Gum, of Oklahoma City, represented AHM.

## II. EXHIBITS

The Court received into evidence without objection the following plaintiff's exhibits: Nos. 1–30. The Court received into evidence without objection the following defense exhibits: Nos. 1, 3–6, 10–13. The

---

1. The Court's summary of the facts closely follows the statement of the case upon which the parties agreed. The parties' statement:

   The Plaintiff alleges that Phyllis Torbeck was discharged from her employment as a Secretary for the Defendant due to her pregnancy. On April 2, 1986, Phyllis Torbeck gave to the Defendant a letter from her obstetrician in which the doctor advised the Defendant that Torbeck should not work more than forty (40) hours per week because of her pregnancy. The following day, Torbeck was discharged. The Defendant had no written policy regarding medical leaves, personal leaves, or schedule adjustments and selectively discriminated against Torbeck, because of her pregnancy. A comparison will be made between Torbeck and similarly situated non-pregnant employees. Testimony will be presented regarding accommodations made for non-pregnant employees who needed work schedule adjustments.
   The Defendant denies that it discriminated in any way against Ms. Torbeck. As is more fully set forth in Defendant's trial brief, the Defendant asserts, principally, that, when she was discharged by Defendant, Ms. Torbeck was (as confirmed in writing by her gynecologist) enjoying a healthy, normal pregnancy, and had given Defendant no reason to believe that her pregnancy necessitated an across-the-board work schedule modification.

Final Pre–Trial Order at 1 (filed Nov. 29, 1990) [hereinafter Pretrial Order].

2. Under the procedure, the parties prior to trial filed affidavits containing all of the proposed direct testimony of each of the witnesses to be called in the cases in chief. At trial, the Court allowed 10 to 15 minutes of direct examination of each witness in order to enable the attorneys to emphasize portions of the testimony contained in the affidavits. Each witness then was tendered for cross-examination. Adverse witnesses were exempt from the affidavit procedure.

   In nonjury trials, whether complex or relatively uncomplicated, the affidavit procedure can eliminate unnecessary evidentiary presentations, reduce the costs to the litigants of the attorneys' trial time, and enable counsel to emphasize to the Court the areas of actual legal and factual dispute. In applying the affidavit procedure, the Court emphasizes more than efficiency. Among the potential advantages of the procedure to a court and the attorneys: (1) by preparing more of the case on paper, counsel may be able better to organize and explain the evidence and the legal issues; (2) counsel should be in a better position to concentrate on, and better develop, the legal and factual issues that are likely to be dispositive of the case; and (3) the procedure may help eliminate pretrial disputes that can be resolved through stipulation and compromise.

Court rejected Defendant's Exhibit No. 7. The Court sponsored the following exhibits: Court's Exhibit Nos. A–Q.[3]

## III. WITNESSES

The EEOC called the following witnesses in its case in chief: Ron Cawthon, former AHM employee; Karen Cottrell, AHM public relations account manager, Washington, D.C., office; James Gregory Cox, M.D., obstetrician and gynecologist; Betty Jo Garner, EEOC paralegal specialist, Dallas district office; Beverly J. Harp, owner of a firm at which Torbeck sought employment; Kathie Jo Marshall, former supervisor of the AHM secretarial pool; Phyllis Kay Torbeck, former AHM secretary; and Ruby Elaine Williamson, former AHM secretary.

AHM called the following witnesses in its case in chief: Raymond B. Ackerman, chairman of the board of directors of AHM; Bruce E. Anderson, AHM executive vice president and director of client services; Karen Cottrell (also an EEOC witness); Jeanette Elliott, AHM senior vice president and creative director; Jana Fielder, assistant to Raymond Ackerman at AHM; Donald J. Loewen, AHM art director; Laura L. Mackie, M.D., obstetrician and gynecologist; Nancy Martin, AHM director of traffic, Tulsa office; Angus L. McQueen, president and chief executive officer of AHM; Christy Tebow, AHM creative services manager; Jenifer J. Ware, former supervisor in AHM accounting office; Patti Weinbrenner, AHM senior vice president; and William F. Winkler, Jr., AHM chief financial officer.

## IV. STIPULATIONS

The parties provided the Court with written stipulations in which they agreed on the following matters:

A. All parties are properly before the court.

B. The court has jurisdiction of the parties and of the subject matter.

C. All parties have been correctly designated.

D. There is no question as to misjoinder or nonjoinder of parties.

E. Facts:

1. The Plaintiff is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Section 706(f)(1) of Title VII, 42 U.S.C. Section 2000e–5(f)(1).

2. At all relevant times, the Defendant has continually been an employer doing business in ... Oklahoma City, Oklahoma and has continuously had at least 15 employees.

3. At all relevant times, the Defendant has continuously been and is now an employer engaged in an industry affecting interstate commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. Section 2000e-(b), (g) and (h).

4. Ackerman, Hood & McQueen is an advertising, marketing and public relations firm based in Oklahoma City. The Chairman of the Board of Ackerman, Hood & McQueen is Ray Ackerman. The President and Chief Executive Officer is Angus L. McQueen. Messrs. Ackerman and McQueen reside in Oklahoma City.

5. Phyllis Torbeck, a female, was hired as a secretary by the Defendant on December 17, 1984.

6. From December 17, 1984, until approximately October 11, 1985, Torbeck's direct supervisor was Ray Ackerman.

7. During the initial period of her employment at Ackerman, Hood & McQueen, Mrs. Torbeck was an executive secretary to Mr. Ackerman and two account executives. Under this arrangement, Mrs. Torbeck reported to, and worked only for, Mr. Ackerman and the two account executives.

8. From the beginning of her employment at Ackerman, Hood & McQueen, through the summer of 1985, Mrs. Torbeck was required to work very little overtime.

---

**3.** The Court received additional exhibits over objection as reflected in the record.

9. Defendant permitted Torbeck to take time off from October 14, 1985, through November 10, 1985, to enable her to have surgery.

10. From November 11, 1985, until February 21, 1986, Torbeck's direct supervisor was Karen Cottrell.

11. From November 11, 1985, until February 21, 1986, Bruce Anderson was Karen Cottrell's supervisor.

12. From February 24, 1986, until April 3, 1986, Torbeck's direct supervisor was Kathy Jo Gardner.

13. From November 11, 1985, through April 3, 1986, both Phyllis Torbeck and Ruby Williamson were secretaries in the "secretarial pool".

14. Ray Ackerman counseled Phyllis Torbeck about overtime on January 14, 1986, at the request of Karen Cottrell.

15. While employed by the Defendant, Torbeck was paid additional compensation for overtime each [hour] she worked in excess of forty hours per week.

16. On April 2, 1986, Bruce Anderson and Ray Ackerman received a note from Phyllis Torbeck's obstetrician, Dr. James G. Cox.

17. Angus McQueen, Bruce Anderson, Ray Ackerman and William Winkler have no medical training.

18. Dr. Laura Mackie was not consulted by the Defendant prior to the discharge of Phyllis Torbeck.

19. Phyllis Torbeck was discharged by the Defendant on April 3, 1986.

20. On April 3, 1986, Phyllis Torbeck was pregnant.

21. Ray Ackerman, William Winkler, Angus McQueen and Bruce Anderson all took part in the decision to discharge Phyllis Torbeck.

22. All persons who took part in the decision to terminate Phyllis Torbeck are still employed by the Defendant.

23. Prior to discharging Phyllis Torbeck, the Defendant consulted its attorneys.

24. The attorneys who were consulted by the Defendant prior to Phyllis Torbeck's discharge are the same attorneys who are representing the Defendant in this action.

25. At the time of her discharge on April 3, 1986, Torbeck's base bi-weekly salary was $750.00.

26. From August 26, 1985, through October 6, 1985, Karen Cottrell, a secretary, worked between 31.25 and 33.-25 hours per week.

27. For the week ending August 18, 1985, Karen Cottrell worked a total of 16.5 hours. A total of 23.25 hours was reported [as] "illness".

28. For the week ending August 25, 1985, Karen Cottrell worked a total of 10 hours. A total of 31 hours was reported as "illness".

29. Jeanette [Elliott] took time off for "illness" on Monday, Wednesday, Thursday and Friday of the week ending April 6, 1986.

30. Don Loewen was permitted time off for medical reasons from April 30, 1985, through June 7, 1985.

31. The Defendant received a Notice of Phyllis Torbeck's Charge of Discrimination by June 25, 1986.

32. The Defendant, by its attorneys, responded to the Charge of Discrimination on July 30, 1986.

33. The Defendant, by its attorneys, submitted an additional position statement on August 14, 1986.

34. On November 9, 1987, the EEOC requested additional information from the Defendant's attorneys.

35. On December 9, 1987, the Defendant, by its attorneys, provided additional information to the EEOC and a further position statement.

36. On January 5, 1987, and on January 21, 1987, the Defendant, by its attorneys, provided additional information to the EEOC.

37. On March 7, 1988, a settlement conference was held, by telephone, with the Defendant and its attorneys.

38. In April of 1988, the Defendant, by its attorneys, sent an inquiry to Harp Associates concerning Phyllis Torbeck's employment search.

39. The Defendant received Notice of the EEOC's Determination, with respect to Torbeck's discharge, on or about February 2, 1989. The notice includes a provision concerning the requirement to keep all relevant documents.

40. On March 24, 1989, the Defendant, by its attorneys, responded by letter, to the EEOC's determination with respect to Torbeck's charge.

41. The documents identified as Plaintiff's Exhibit 6 are true and correct copies of the time sheets for Karen Cottrell from August 11, 1985, through October 6, 1985.

42. The documents identified as Plaintiff's Exhibit 3 are true and correct copies of the time sheets of Ruby Williamson from December 1, 1985, through March 30, 1986.

43. The documents identified as Plaintiff's Exhibit 2 are true and correct copies of the time sheets of Phyllis Torbeck from December 1, 1985, through March 30, 1986.

44. The document identified as Plaintiff's Exhibit 1 is a true and correct copy of the letter written by Dr. Cox and submitted by Phyllis Torbeck to Ackerman, Hood and McQueen, Inc., management on April 2, 1986.

45. The document identified as Plaintiff's Exhibit 15 is a true and correct copy of the Notice of Charge of Discrimination received by the Defendant.

46. The document identified as Plaintiff's Exhibit 17 is a true and correct copy of the Defendant's July 30, 1986, response to the EEOC.

47. Plaintiff's Exhibits 1, 2, 3 and 6 are authentic copies of the Defendant's business records.

48. Exhibits 5 and 6 are authentic copies of the business records of the EEOC.

Pretrial Order sec. II, at 2–6.

The Court adopts the stipulations as part of its findings of fact and conclusions of law.

## V. ADDITIONAL FINDINGS OF FACT

In addition to the stipulated facts listed above, the Court makes the following factual findings:

1. On January 10, 1986, Torbeck underwent a pregnancy test at Dr. Cox's office. The test was positive. At the time of the test, Torbeck was approximately five weeks pregnant. Shortly after she learned the results of the test, Torbeck announced her pregnancy to coworkers at AHM. A supervisory employee testified that she reacted to Torbeck's announcement by saying to herself: "Oh no, now we will never be able to fire her." Shortly after Torbeck's announcement, AHM management reviewed her job performance and for the first time criticized her work. The timing and circumstances of this review are highly suspicious because Torbeck had not been formally counseled prior to announcing her pregnancy. There is no credible testimony or documentary corroboration of any intent on the part of AHM to terminate Torbeck prior to the time she announced her pregnancy.

2. On February 13, 1986, Dr. Cox examined Torbeck. As a result of the examination, Cox concluded that Torbeck was in "good health," but that she was experiencing some fatigue and nausea. During March 1986, Torbeck experienced fatigue as a result of her work, and headaches and lower back pain. Torbeck worked overtime in both February and March of 1986. The Court found credible Torbeck's testimony that she experienced discomfort during this time period and that she communicated the discomfort to coworkers.

3. On March 12, 1986, Dr. Cox again examined Torbeck.

4. Following the March 12, 1986, examination, Torbeck contacted Dr. Cox's office. Torbeck complained to a nurse of fatigue, headaches, and lower back pain.

5. During Torbeck's checkups on March 12 and April 11, Dr. Cox did not observe any signs or symptoms that indicated a high-risk pregnancy or a pregnancy with complications. Cox had no reason to believe that Torbeck was experiencing complications of the type that would threaten the

well-being of either the mother or the fetus.

6. In a letter dated March 31, 1986, Dr. Cox wrote, in pertinent part:

TO WHOM IT MAY CONCERN:

RE: PHYLLIS TORBECK

Mrs. Torbeck has been under my medical care since early in her current pregnancy. Her estimated due date is September 14, 1986.

She is in good health, but because of her pregnancy, it is my recommendation that she not be required to work more than a 40 hour work week.

Sincerely,

/s/

J. Gregory Cox, M.D.

Plaintiff's Exhibit No. 1.

7. When he wrote the letter, Dr. Cox believed Torbeck was in "good health." Cox explained that Torbeck "wasn't physically sick or anything like that." At his deposition Cox could recall no complaints other than fatigue that Torbeck had reported as of the time he wrote the letter. At the time he wrote the letter, Cox did not know: (1) how much overtime Torbeck was working, or (2) whether the overtime she was working consisted of longer work days or longer work weeks. However, Torbeck had described her work routine and situation to Cox in general terms before he wrote the letter.

8. On April 2, 1986, Torbeck submitted her doctor's letter to AHM. Torbeck was discharged the next day, April 3, 1986, following a brief meeting with Bruce Anderson. Having already prepared a draft letter of discharge, Anderson sought at the meeting to determine only whether Torbeck intended to follow her doctor's recommendation.

9. AHM explored no alternative schedule changes with Torbeck, and sought to make no accommodation for her pregnancy.

10. When Torbeck indicated that she intended to follow her doctor's recommendation, AHM discharged Torbeck for the stated reason that she had failed to meet the terms and conditions of her employment, one of which was the necessity of working overtime. Raymond Ackerman, Bruce Anderson, William Winkler, and Angus McQueen participated in the decision to discharge Torbeck. As of the time of trial, all four men remained in the employment of AHM. None of these individuals had any medical training.

11. From January 14 through April 2, 1986, the AHM management did not counsel Torbeck about her job performance or about the adequacy of the hours she was working.

12. AHM did not discuss Torbeck's condition with her after management received Dr. Cox's letter, and made no attempt to accommodate her request to work fewer hours. AHM did not consult with Cox prior to firing Torbeck.

13. Although the doctor's letter could have contained more detail, it clearly put AHM on notice of a medical recommendation by Torbeck's physician. Rather than make further inquiry about the circumstances giving rise to Dr. Cox's recommendation, AHM summarily discharged Torbeck after determining that she intended to follow her doctor's recommendation. The Court found to be credible Cox's testimony to the effect that he would not have made the recommendation had he not felt that it was medically appropriate.

14. The Court finds that Dr. Cox wrote the letter because he believed a slight reduction in work hours might alleviate or lessen Torbeck's pregnancy-related symptoms.

15. AHM neither advised Torbeck of any additional medical documentation that would be required for her to obtain a schedule adjustment nor told her that Dr. Cox's letter was insufficient.

16. At all times relevant to this litigation, AHM had no written policies governing medical leave, work schedule adjustments, leave for personal reasons, or other possible schedule accommodations to employees. AHM had no firm policy setting the length of time that an employee could be off work on medical or personal leave. The defendant did, however, as a practice

permit an employee to take six weeks of paid maternity leave.

17. AHM treated Torbeck differently from other similarly situated employees because she was pregnant. Whether Torbeck is compared with employees who requested work schedule modifications for medical reasons, "medical necessity," or for no medical reasons, it is clear to the Court that AHM took adverse action against Torbeck, and discriminated against her, because she was pregnant.

18. The evidence revealed that AHM granted work reductions to several nonpregnant employees who requested leave time and/or other schedule adjustments and accommodations.

19. The defendant used sick time, vacation time, and personal time to accommodate the requests of its employees for schedule adjustments. Jeanette Elliott used both personal time and sick time to enable her to undergo plastic surgery. Torbeck used both sick time and vacation time to enable her to schedule elective surgery in October 1985. AHM designated the type or types of leave to be used by an employee.

20. The defendant neither probed into the reasons for an employee's request for personal leave, nor required its employees to show medical necessity in order to be granted medical leave.

21. From October 14 through November 10, 1985, prior to her pregnancy, Raymond Ackerman granted Torbeck medical leave.

22. Torbeck's leave in October and November 1985 was not medically necessary. AHM did not threaten Torbeck with the loss of her job for making the request for a leave to enable her to schedule elective surgery.

23. Torbeck's job performance prior to, and after, January 10, 1986, was comparable to that of account service employee Ruby Williamson.

24. Karen Cottrell, a full-time employee of AHM, in 1985 was granted a schedule adjustment for emotional problems arising out of a domestic dispute. Cottrell was required neither to submit a physician's letter nor to make a showing of medical necessity in order to obtain the leave. Other employees who were granted leave for medical reasons were not required to make the type of showing of need that Torbeck made, or the type of showing of medical need that AHM now contends was necessary. Similarly, AHM employees who took leave, or who requested schedule adjustments, for nonmedical reasons encountered a loose company policy toward such leave; the defendant liberally granted such requests.

25. Contrary to the defendant's contentions, Torbeck was not discharged because she refused to comply with the terms and conditions of her employment. The Court also rejects the defendant's efforts to paint Torbeck as a poor employee who was headed towards termination anyway; the testimony to this effect was uncorroborated by any credible documentation and the Court generally found testimony on this point lacking in credibility. Specifically, the Court finds that after Torbeck announced her pregnancy, AHM, in a pretextual effort to establish a basis for its later action, "wrote up" Torbeck based upon complaints allegedly received over the preceding six weeks. The Court finds that the testimony concerning these so-called "complaints" lacks credibility.

26. The defense, in the Court's view, attempted to shift the focus of the trial from the conduct of AHM that followed Torbeck's announcement that she was pregnant to the conduct of Torbeck and her doctor. With the benefit of hindsight, Torbeck's doctor perhaps could have drafted a more artful letter. Following the receipt of Dr. Cox's letter, AHM easily could have made a reasonable inquiry about the basis of the letter. As a result, the company would have learned about the doctor's concerns, and would have been able to accommodate Torbeck's request.

27. Pregnancy itself is not considered an illness. However, the American College of Gynecology Technical Bulletin No. 58 lists three categories of possible recommendations regarding a woman's work sched-

ule during pregnancy. The possible recommendations: option No. 1—continue to work without change; option No. 2—continue to work with certain modifications in activity; and option No. 3—discontinue work. In the Court's view, Dr. Cox's letter, coupled with reasonable inquiry by AHM management following the receipt of Cox's letter, should have triggered option No. 2.

28. Prior to April 1986, Torbeck did not complain to AHM management that her pregnancy was causing physical problems. Torbeck mentioned to coworkers during this time period that she was experiencing fatigue, but her comments to colleagues did not rise to the level of complaints to management. Dr. Cox's letter, however, put AHM management on reasonable notice that medical problems might arise if a schedule modification was not made.

29. In submitting the letter from her doctor to AHM, Torbeck went beyond the showing of medical need that had been made by other employees who had requested, and had been granted, medically related work schedule adjustments.

30. The Court will not punish Torbeck merely because her doctor arguably drafted the letter to her employer in an inartful, unlawyerlike way. An inquiry by AHM management would have revealed the medical basis for Dr. Cox's letter, and a reasonable accommodation could have been tailored to fit Torbeck's needs. The Court finds, contrary to AHM's contentions, that a medical basis for a schedule modification existed, that the medical basis was communicated to the defendant, that the requested accommodation was commensurate with Torbeck's general physical complaints, and that Torbeck was treated in a fashion dissimilar to the treatment of other employees in her attempt to gain a work schedule modification.

31. The Court further finds that because she was pregnant AHM discriminated against Torbeck by failing to accommodate her reasonable request for a work schedule modification and by firing her. The Court finds that AHM did not conduct the meetings with Torbeck immediately prior to her discharge with the intent of retaining her. Rather, AHM convened the meetings with Torbeck for the purpose of firing her. A discharge letter already had been prepared at the time the defendant instructed members of its management to make only limited and narrow inquiries of Torbeck in the meetings that preceded her firing.

32. Had Torbeck not requested a pregnancy-related schedule adjustment through her doctor, she would not have been fired on April 3, 1986. Contrary to AHM's contentions, Torbeck did not refuse to work overtime. During both February and March 1986, Torbeck's work records reflect overtime earnings. Had Torbeck remained in the employment of AHM, she would have received six weeks of paid maternity leave.

33. The Court also rejects the defense contention that Torbeck failed to mitigate her damages. Torbeck continuously sought alternative employment from April 3 through December 31, 1986.

34. As a result of her discharge from AHM, Torbeck lost wages and benefits. Her weekly base salary was $375. Under the EEOC's calculations, Torbeck's lost wages from the date of her discharge to the date of the birth of her baby, September 20, 1986, total $13,984; the interest totals $7,105.82. The total amount of Torbeck's lost wages and interest is $21,089.82. The Court finds these calculations appropriate.

## VI. CONCLUSIONS OF LAW

### A. *Law Applicable in General to Claim of Pregnancy Discrimination Under Title VII*

1. The EEOC alleged that AHM fired Torbeck because she was pregnant, a violation of Title VII. In general, Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee with respect to compensation, terms and conditions of employment, or

benefits because of the person's sex.[4] An amendment, the Pregnancy Discrimination Act of 1978 ("the Act"), specifically defines discrimination on the basis of pregnancy, childbirth, or medical conditions related to pregnancy as unlawful sex discrimination under Title VII.[5] The Act states, in pertinent part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work....

42 U.S.C. § 2000e(k) (1988).

2. In a Title VII claim based upon indirect evidence of disparate treatment, the plaintiff must satisfy a threshold requirement of establishing a prima facie case.[6] The prima facie case that the Supreme Court outlined in *McDonnell Douglas Corp. v. Green* has become a model.[7] The Supreme Court intended the *McDonnell Douglas*-type prima facie case to give courts guidance in assessing whether a Title VII plaintiff can present a minimal level of proof of discrimination.[8] A court should test the facts of a case under an appropriate formulation of prima facie elements in order to determine whether the plaintiff's proof raises an inference of discrimination;[9] a court should not apply the factors

---

**4.** 42 U.S.C. § 2000e-2(a) (1988). The section states, in pertinent part:
> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin....

*Id.* (emphasis added).

**5.** 42 U.S.C. § 2000e(k) (1988). As a definitional section to Title VII, the Act provides no separate cause of action for discrimination on the basis of pregnancy. The Act defines pregnancy and related conditions as among the impermissible bases of discrimination outlined in § 2000e-2. Title VII generally prohibits disparate treatment of employees on the basis of impermissible criteria such as pregnancy. *See, e.g., International Bhd. of Teamsters v. United States,* 431 U.S. 324, 334–36 & n. 15, 97 S.Ct. 1843, 1854–55 & n. 15, 52 L.Ed.2d 396 (1977) (disparate treatment "most obvious evil Congress had in mind" in enacting Title VII).

For a brief discussion of the legislative history of the Act, see *Carney v. Martin Luther Home, Inc.,* 824 F.2d 643, 646–47 (8th Cir.1987) (broad purpose of Act was "to prevent the differential treatment of women in all aspects of employment based on the condition of pregnancy").

**6.** A prima facie showing is not required in cases in which the plaintiff presents direct evidence of discrimination. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121–22, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). In this litigation, both parties proceeded under the assumption that a prima facie showing was required. The Court agrees that the EEOC's case involves indirect evidence.

**7.** In *McDonnell Douglas,* the Supreme Court explained that a plaintiff may make a prima facie case of racial discrimination by showing:
> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted). Appellate courts adapt the model factors to cases involving allegations of other forms of discrimination, including discriminatory discharge. *See, e.g., Brown v. Parker–Hannifin Corp.,* 746 F.2d 1407, 1409 (10th Cir.1984) (claim of discharge based upon national origin).

**8.** The Supreme Court's summary of one purpose of the prima facie proof requirement: "The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

**9.** The Supreme Court has explained:
> The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the act.

*Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866.

mechanically.[10]

3. A court evaluates a Title VII plaintiff's indirect evidence under the Supreme Court's three-step, burden-shifting framework. The process progressively focuses the case on the alleged discrimination.[11] The Supreme Court has summarized the steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). The burden on the plaintiff in step one, of proving a prima facie case, is "not onerous." *Id.* at 253, 101 S.Ct. at 1093–94. The intermediate burden on the defendant in step two, of presenting admissible evidence of a nondiscriminatory rea-

son for the action taken against the employee, is a relatively light burden of production. *Id.* at 254–56, 101 S.Ct. at 1094–95. In step three, the plaintiff carries the burden of disproving the reason that the employer asserted for the action. *Id.* at 256, 101 S.Ct. at 1095. Through all three steps, a Title VII plaintiff retains the ultimate burden of persuasion, the burden of persuading the trier of fact that intentional discrimination occurred. *Id.* at 253, 101 S.Ct. at 1093–94.

B. *Establishment of a Prima Facie Case of Discrimination*

■ 1. In the Tenth Circuit, a plaintiff may establish a prima facie case of discriminatory discharge by presenting evidence that satisfies the first three elements of the *McDonnell Douglas* test, and by producing evidence that the position at least remained available after the firing.[12] Under the basic Tenth Circuit factors, a plaintiff may establish a prima facie case of discriminatory discharge by showing: (1) that the employee was a member of a group protected by Title VII; (2) that the employee was qualified for the job; (3) that the employee was fired despite his or her qualifications for the job; and (4) that after the employee was discharged, either the

---

**10.** In a footnote to the statement of the model case, the Supreme Court wrote: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

**11.** *Burdine*, 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8. The process also "assures the plaintiff his day in court despite the unavailability of direct evidence, and entitles him to an explanation from the defendant-employer for whatever action was taken." *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979).

**12.** *Brown,* 746 F.2d at 1409–10 (citing *Crawford v. Northeastern Okla. State Univ.,* 713 F.2d 586, 588 (10th Cir.1983)). The exact formulation of the elements of the prima facie proof was one of the areas of dispute in the litigation.

The EEOC proposed that the Court evaluate its prima facie case as a discriminatory denial of benefits claim. The EEOC proposed as prima

facie factors: (1) "membership in a protected class"; (2) "entitlement to a benefit"; and "denial of the benefit while the benefit is granted to others *or* differential processing of entitlement." Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law para. 13, at 12 (filed Jan. 11, 1991) (emphasis original).

AHM proposed a more stringent version of the basic elements for testing a discriminatory discharge claim. AHM proposed as prima facie elements:

> (1) the employee was a member of a protected class; (2) she was discharged; (3) she was qualified for, and adequately performed, her job at the time of her discharge; and (4) other similarly situated employees with comparable qualifications and work record who were not members of the protected class were not discharged, or the defendant replaced her or sought to replace her with someone of equal qualifications who was not a member of the protected class.

Trial Brief of Defendant, Ackerman, Hood and McQueen, Inc. at 8–9 (filed Nov. 28, 1990) [hereinafter AHM's Trial Brief].

employer filled the job or the position remained available.[13]

2. Even in the absence of proof under the final element, the EEOC established a prima facie case that AHM discharged Torbeck because she was pregnant. The EEOC did not provide evidence that Torbeck was replaced or that her position remained available. However, the EEOC has presented evidence that would satisfy even some of the more stringent formulations of Title VII prima facie cases.[14]

3. The EEOC has established the first and third elements of the prima facie case. Torbeck was a member of a protected class under Title VII because when she was fired she was approximately four months pregnant. *See* 42 U.S.C. § 2000e(k).

4. The EEOC has established the second element of the prima facie case by showing objective evidence that Torbeck was qualified for, and was performing, her job. For purposes of a prima facie case, a court should consider only employee qualifications that may be measured objectively. *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1344–45 & n. 8 (9th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982); *see also Legrand v. Trustees of Univ. of Ark. at Pine Bluff*, 821 F.2d 478, 481 (8th Cir.1987) (in a prima facie case, plaintiffs needed only show "objective" job qualifications), *cert. denied*, 485 U.S. 1034, 108 S.Ct. 1592, 99 L.Ed.2d

907 (1988). Torbeck had worked as a secretary for the firm for more than a year.[15] Under the objective evidence, Torbeck was qualified to work as a secretary and was performing her job as a secretary.[16]

5. The EEOC has produced sufficient evidence of disparate treatment to raise an inference that AHM discharged Torbeck because she was pregnant. The EEOC's principal evidence that established a prima facie case included: (1) that the AHM management began criticizing Torbeck's work after she announced that she was pregnant; (2) that AHM fired Torbeck when she sought to reduce her work schedule to 40 hours a week; (3) that AHM liberally accommodated other employees' requests for leaves and schedule adjustments under an unwritten policy; and (4) that in response to Torbeck's request for reduced working hours AHM management applied a higher standard, medical necessity, than it applied to other employees' requests for leave and schedule adjustments. In summary, the EEOC has presented sufficient evidence from which one could infer, in the absence of another explanation, that because after she became pregnant Torbeck was treated differently than other employees were treated, she was discharged because she was pregnant.

6. For the purposes of a prima facie case based upon a disparate treat-

---

**13.** Under the Tenth Circuit's statements of the fourth element, a showing either that the fired employee's position remained available or that the employer filled the position may establish a prima facie case. *See Brown*, 746 F.2d at 1409–10; *Crawford*, 713 F.2d at 588. The variations in the Circuit's statements of the element illustrate that formulations of prima facie cases are flexible.

**14.** In *Brown*, the Tenth Circuit applied a similar analysis in a case in which the plaintiff had not presented evidence that "her job remained available after her discharge." *Brown*, 746 F.2d at 1410. The approach is consistent with the Supreme Court's admonition that the four *McDonnell Douglas* factors "were not cast as a rigid rule to apply to all factual situations." *Brown*, 746 F.2d at 1409. After scrutinizing a plaintiff's evidentiary offerings, a court may allow a plaintiff to proceed if the evidence demonstrates merely a "potential for a prima facie case at trial." *Byrd v. Roadway Express, Inc.*, 687 F.2d

85, 86–87 (5th Cir.1982), *quoted in Brown*, 746 F.2d at 1410.

**15.** The Court also considered that Torbeck was not on formal probation, as well as her testimony that she had not been "counseled" prior to her pregnancy, and that she had been working overtime. Affidavit of Phyllis Kay Torbeck paras. 8, 13 (filed Dec. 17, 1990).

**16.** In arguing that the EEOC did not establish a prima facie case, AHM asserted that Torbeck was not adequately performing her job because she was refusing to work overtime. Whether Torbeck refused to work overtime was one of the disputed factual issues in the case; the Court eventually decided the issue in the employee's favor. The argument was based upon a subjective evaluation of AHM's evidence, and properly was addressed at the third stage. *See Lynn*, 656 F.2d at 1344–45 & n. 8 (basic objective criteria are addressed in prima facie case).

ment argument, the EEOC made comparisons between Torbeck and "similarly situated" employees.[17] AHM argued that the prima facie case failed because the EEOC produced no evidence that compared Torbeck's firing to "similarly situated" AHM employees who were retained under similar circumstances. A claim may fail if the evidence of disparate treatment presented in the prima facie showing does not involve "similarly situated" or comparable employees.[18] In Torbeck's case, a comparison with "similarly situated" employees was not difficult; the EEOC compared AHM's treatment of Torbeck with the firm's treatment of other AHM employees who were subject to the same unwritten policy governing leaves and work schedule adjustments.

7. The EEOC established a prima facie case in support of the discriminatory discharge claim by presenting sufficient evidence from which the Court could infer intentional discrimination on the basis of Torbeck's pregnancy. Because the EEOC established a prima facie case, a presumption arose that AHM unlawfully discriminated against Torbeck. *See Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.

### C. *Defendant's Burden of Articulating a Nondiscriminatory Reason for the Discharge*

1. If a Title VII plaintiff establishes a prima facie case, the defendant must produce evidence of a nondiscriminatory reason for the job action in order to prevent an adverse judgment. A defendant's burden in rebutting the presumption of unlawful discrimination is one of production; a defendant is not required to persuade a court that it actually was motivated by the asserted reason. *Burdine*, 450 U.S. at 254–

56, 101 S.Ct. at 1094–95. If a defendant satisfies its burden, the presumption of discrimination created by the prima facie case is eliminated. *Id.*

2. The defendant carried its burden of rebutting the EEOC's prima facie case by offering testimony that AHM management discharged Torbeck for insubordination, or, for refusing to satisfy a condition of her employment that she work overtime. Insubordination is a legitimate, nondiscriminatory reason for a firing. *See, e.g., Nulf v. International Paper Co.*, 656 F.2d 553, 559 (10th Cir.1981). AHM's proffered reason satisfied the requirement because it created a genuine question of fact as to whether the employer discharged Torbeck for discriminatory reasons. *See Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

### D. *Plaintiff's Burden to Prove Discrimination*

1. If a Title VII defendant carries the intermediate burden, the plaintiff bears the burden of proving by a preponderance of the evidence that the employer's actions were discriminatory. In general, a plaintiff may attempt to prove discrimination by showing either that the reason offered by the employer merely was a pretext for discrimination or that the plaintiff was the victim of disparate treatment. *Nulf*, 656 F.2d at 559.

2. A plaintiff is not required to prove that unlawful discrimination was the sole basis for the employer's actions. The plaintiff must show only that "but for" the unlawful motive the employer would not have taken the action. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976) (in Title VII race discrimination case,

---

**17.** In discussing the assignment of burdens of production and persuasion in a Title VII case, the Supreme Court in *Burdine* stated: *"McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. The reference in Burdine to comparisons with "similarly situated" employees referred to a discussion in *McDonnell Douglas* about the plaintiff's burden in *step three* of disproving the employer's assert-

ed nondiscriminatory reason. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

**18.** *See, e.g., Hughes v. Chesapeake & Potomac Tel. Co.*, 583 F.Supp. 66, 70 (D.D.C.1983) (plaintiff did not prove prima facie case of race discrimination in part because she did not show "that other employees with similar work and attendance records, who were not members of a racial minority, were not terminated").

"no more is required to be shown than that race was a 'but for' cause.").

■ 3. A Title VII plaintiff may prove in at least two ways that the stated reason for the job action was a pretext for discrimination. The plaintiff may prove pretext either (1) "directly by persuading the court that a discriminatory reason more likely motivated the employer," or (2) "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Here, the EEOC has persuaded the Court in both of these ways. Among the evidence that may be relevant to proving pretext in a claim of discharge on the basis of pregnancy is: the employer's reaction, if any, to the employee's pregnancy; the employer's treatment of the employee before and after the pregnancy began; and the employer's policies concerning employee pregnancy.[19]

■ 4. The EEOC proved by a preponderance of the evidence that the reason that AHM advanced for firing Torbeck, insubordination, was a pretext for discrimination.[20] Viewed as a whole, the evidence showed both that the proffered reason was not credible and that Torbeck's pregnancy likely was at least part of AHM's motivation for firing her. AHM has justified firing Torbeck by asserting that she had refused to work overtime, one of the condi-

tions of her employment. After weighing the evidence, the Court concluded that the proffered reason lacked credibility partly because the firing fit a pattern of adverse actions taken by management against Torbeck that began shortly after she announced her pregnancy. Despite a liberal policy of granting schedule accommodations to its employees, AHM made no attempt to accommodate Torbeck's request. AHM's management declared the doctor's letter insufficient to support need, but neither made further medical inquiry on its own nor allowed Torbeck the opportunity to obtain additional evidence of need. AHM held Torbeck's request to a higher standard than it normally applied to requests for schedule adjustments. The evidence, beginning with the timing of the "counseling" session, indicates that Torbeck would not have been discharged had she not become pregnant. Considering the evidence as a whole, the EEOC has shown that the reason given for the firing, insubordination, was pretextual.

5. The EEOC proved by a preponderance of the evidence that AHM did not evaluate Torbeck's request for reduced hours on the same basis that it evaluated similar requests by similarly-situated, nonpregnant employees. Torbeck was entitled to nondiscriminatory consideration of her request for a work schedule reduction.[21]

---

**19.** *See McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26. While the Supreme Court listed similar factors as potentially relevant to proving pretext in a claim of racial discrimination, they are factors that may be relevant in proving pretext in many types of cases.

**20.** The reasons that AHM proffered for discharging Torbeck are discussed in the findings of fact. Insubordination was the paramount reason.

**21.** *See Hishon v. King & Spalding*, 467 U.S. 69, 75–76, 104 S.Ct. 2229, 2233–34, 81 L.Ed.2d 59 (1984) (under Title VII "benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion" even if the employer is not required to provide the benefit).

*See also* Questions and Answers on the Pregnancy Discrimination Act, 29 C.F.R. pt. 1604 app., Nos. 5, 6, at 205 (1990). The question and answer section in the *Code of Federal Regulations* concerning the Pregnancy Discrimination

Act explains that a pregnant employee's request for benefits based upon her physical condition must be processed the same as any other employee's request.

6. Q. What procedures may an employer use to determine whether to place on leave as unable to work a pregnant employee who claims she is able to work or deny leave to a pregnant employee who claims that she is disabled from work?

A. An *employer may not single out pregnancy-related conditions for special procedures for determining an employee's ability to work.* However, an employer may use any procedure used to determine the ability of all employees to work. For example, if an employer requires its employees to submit a doctor's statement concerning their inability to work before granting leave or paying sick benefits, the employer may require employees affected by pregnancy-related conditions to submit such statement. Similarly, if an employer allows its employees to obtain doctor's state-

The EEOC demonstrated that AHM usually liberally granted schedule accommodations under an unwritten policy; AHM measured Torbeck's request against a standard of medical necessity. In addition, AHM made no attempt to accommodate Torbeck through the variety of means typically offered to other employees. When Torbeck asked for an accommodation, instead of denying the request or making further inquiry, AHM fired her. Considered as a whole, the evidence showed that AHM treated Torbeck differently than other employees.

6. In Torbeck's case, AHM did not follow its previous practice for considering employees' requests for leave or schedule adjustments. AHM described its unwritten policy as one of *evaluating* employees' requests for schedule adjustments on a case-by-case basis and of *attempting to accommodate* each employee's request. AHM attempted to accommodate other employees' requests for schedule adjustments with a combination of sick time, personal leave time, and vacation time; AHM did not offer the same alternatives to Torbeck. Torbeck's supervisors neither investigated her medical condition nor advised her that they did not view the letter from her physician as a satisfactory basis for a schedule adjustment. In summary, AHM neither seriously evaluated Torbeck's medical condition nor made an attempt to accommodate her request.

7. In attempting to prove that Torbeck was subject to disparate treatment, the EEOC made comparisons between Torbeck and "similarly situated" employees. The comparisons were appropriate in this case partly because all of the employees were subject to the same unwritten leave and schedule adjustment policies.

8. AHM's assertion that Cox's letter did not demonstrate medical necessity was pretextual. While fatigue, nausea, lower back pain, and headaches are common symptoms of pregnancy, the symptoms vary with the individual. The expert witnesses agreed that physicians generally recommend rest to alleviate such symptoms of pregnancy. Torbeck's request for reduced hours was in general terms a typical, reasonable request by a pregnant employee. Without any investigation, AHM could not reasonably have determined whether and to what extent some accommodation was warranted in Torbeck's case.[22] Title VII does not place on the employer a burden to investigate a pregnant employee's physical condition; however, AHM's failure to make any effort to clarify Cox's recommendation was evidence of conduct that the Court considered as relevant to AHM's motives. Also significant was the evidence that AHM had not required a showing of medical necessity in considering other requests for medically related leaves and schedule adjustments.

9. The EEOC has shown by a preponderance of the evidence that "but for" Torbeck's pregnancy, AHM would not have discharged her. Having concluded that AHM's stated reason for the discharge, insubordination, was pretextual and lacked credibility, the Court also has concluded that the surrounding circumstances support an inference of discrimination. Within days after she announced at work that she was pregnant, AHM for the first time formally "counseled" Torbeck about her attitude toward working overtime and criticized her work. When Torbeck submitted a letter from a doctor that indicated that she should work no more than a 40–hour week, she was almost summarily dis-

ments from their personal physicians for absences due to other disabilities or return dates from other disabilities, it must accept doctor's statements from personal physicians for absences and return dates connected with pregnancy-related disabilities.
*Id.* (emphasis added).

**22.** The employer's failure to make any serious attempt to investigate the letter merely was one factor in the Court's conclusion that the defendant's "medical necessity" argument was pretex-

tual. An investigation of Torbeck's request could have taken many forms, and the type is relatively unimportant. For example, AHM management could have discussed with Torbeck its doubts about the validity of the letter and about the necessity of her request. Under a different set of facts, even an employer's extensive investigation of a similar letter might not outweigh the evidence that the stated reason for the discharge was pretextual.

charged. The EEOC has persuaded the Court that the AHM management handled Torbeck's application for a schedule adjustment differently than it handled other employees' similar requests. Considering testimony such as the timing of the counseling session, management's reaction to her doctor's letter, and the timing of her firing soon after she requested a reduction in hours, the Court has concluded that AHM would not have fired Torbeck had she not become pregnant. The evidence showed no convincing reason for the treatment that Torbeck received other than her pregnancy.

### E. Other Conclusions of Law

1. The discrimination against Torbeck was possible partly because of the broad discretion possible under AHM's unwritten policies concerning employees' requests for leave and schedule adjustments. Unwritten policies may become "tools of discrimination" because they allow for highly discretionary enforcement. *Dunning v. National Indus., Inc.,* 720 F.Supp. 924, 931–32 (M.D.Ala.1989). The evidence showed that AHM liberally granted other employees' requests for leaves and reduced work schedules. In Torbeck's case, AHM management applied a stricter policy, requiring a higher quality of proof of her medical condition than it required of other employees. Though management seemingly was dissatisfied with the quality of Torbeck's proof of need, no policy was available to inform her of what type of proof of medical need would be sufficient.

■ 2. A pregnant employee is not required to show medical necessity in order to fall within the protection of Title VII.[23] The concept of requiring an employee to show "medical necessity" is not found in the language of the statute, and the Court declines the defense invitation to judicially augment this legislation. A court's proper

role in a Title VII case involving an allegation of discrimination on the basis of pregnancy is to determine whether the employer's actions were discriminatory. A court's role is not to attempt to determine the physical capacity to work of a particular pregnant employee. *See EEOC v. Southwestern Elec. Power Co.,* 591 F.Supp. 1128, 1132 (W.D.Ark.1984) (court's role is to determine whether sex discrimination occurred, not "how long it takes to recover from having a baby").

3. The EEOC did not unreasonably delay in processing Torbeck's charge of discrimination. In general, in order to bar the EEOC prosecution of the case the Court would have had to find an inexcusable delay that resulted in undue prejudice to AHM. *See, e.g., EEOC v. Dresser Indus., Inc.,* 668 F.2d 1199, 1202 (11th Cir.1982).

4. Torbeck made a diligent search for employment from April 3, 1986, through December 3, 1986. The EEOC stated that Torbeck stopped actively looking for employment as of December 31, 1986.

5. Any finding of fact that is more properly considered as a conclusion of law shall be deemed to be a conclusion of law, and any conclusion of law that is more properly deemed a finding of fact shall be deemed a finding of fact.

### F. Relief

■ 1. Under Title VII, a court has "considerable leeway" to tailor relief to the facts of a case. *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 267 n. 1 (10th Cir.1975); *see also* 42 U.S.C. § 2000e–5(g). Whether to award monetary compensation, including back pay and attorney fees, is within the discretion of a trial court, and is subject to review only under an abuse of discretion standard. *Taylor,* 524 F.2d at 267, 268.

---

23. AHM argued that as part of a prima facie case the EEOC was required to show that Torbeck had been qualified to obtain the benefit by demonstrating that a reduced schedule was medically necessary. The cases that AHM cited do not support the blanket contention that a plaintiff must show medical necessity in order to obtain leave or other benefits. *See, e.g.,*

*EEOC v. Southwestern Elec. Power Co.,* 591 F.Supp. 1128, 1133–34 (W.D.Ark.1984) (plaintiff did not prove need for additional maternity leave under employer's policy that required adequate medical proof). The Court has found in this case that AHM did not uniformly require proof of medical necessity.

2. Torbeck is entitled to an award of lost earnings and interest in the amount of $21,089.82.

3. An injunction will issue against AHM in order to prevent further discriminatory treatment of its pregnant employees. Upon a finding of an intentional, unlawful employment practice, Title VII authorizes a court to enjoin an employer from engaging in the practice. 42 U.S.C. § 2000e–5(g). The EEOC has asked the Court: (1) to enjoin AHM from violating Title VII, and (2) to direct AHM to develop and implement a nondiscriminatory, written policy concerning leaves and schedule adjustments. The EEOC's injunctive request is granted.

4. The Court will award costs and attorney fees, if appropriate, upon proper application.

### VII. CONCLUSION

The EEOC has proven by a preponderance of the evidence that Torbeck would not have been fired had she not been pregnant. Beginning with her announcement that she was pregnant, the evidence showed a pattern of events from which the Court concluded that Torbeck's employer treated her differently because she was pregnant. The reason that her employer gave for firing Torbeck, insubordination, lacked credibility; the EEOC proved that the proffered reason merely was a pretext for discrimination.

Counsel for the EEOC shall prepare and file no later than February 28, 1991, an entry of judgment, including an injunctive order, consistent with this Order and approved only as to form by counsel for AHM.

IT IS SO ORDERED.