Hubert O. SCHULTZ and Doyle C. Alley, Plaintiffs–Appellants,

v.

GENERAL ELECTRIC CAPITAL CORPORATION, Defendant–Appellee.

Nos. 93–3273, 93–3321.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1994.

Decided Oct. 5, 1994.

Vicki Lafer Abrahamson (argued), Carrie J. Lausen, Abrahamson & Associates, Chicago, IL, for Hubert O. Schultz.

Doyle C. Alley, pro se.

Camille A. Olson (argued), Raymond J. Kelly, Cynthia C. Mooney, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for General Elec. Capital Corp.

Before ENGEL,* BAUER, and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

Herbert Schultz and Doyle Alley were both terminated by General Electric Capital Corporation in 1990. They brought this suit pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 623(a), 626(b),

---

* The Honorable Albert J. Engel, Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

claiming that each was terminated because of his age. General Electric made a motion for summary judgment, which the district court granted. Schultz and Alley appeal the district court's decision, and we affirm.

## I. Facts

General Electric Capital Corporation operates a division, Vendor Equipment Financing (VEF), that provides financing to equipment manufacturers, distributors, and franchisees through equipment leasing and financing programs. Its principal customer base consists of franchisees of national franchisors, such as Hardees and Dunkin' Donuts. This whole business began in late 1989 when VEF purchased the accounts of the Transamerica Commercial Finance Corporation in the fast-food and lodging industries. Under the sales agreement, VEF agreed to offer employment to sixty Transamerica employees. Schultz and Alley were two of the Transamerica employees hired by VEF at this time.

### A. Alley's Employment Situation

Alley was hired by Randolph Wexler, VEF's Manager of Marketing, to perform the role of District Marketing Manager. Alley's main responsibilities were to solicit and obtain lease agreements with individual franchisees of national lodging or fast-food franchisors. He began with VEF on December 4, 1989, at the age of 57.

From the beginning of his tenure, Alley did not perform as well as his peers. By April, Alley's boss had sent him a memorandum instructing him that he "better get some [sales] numbers in here or we're all going to be history." Alley responded to that memorandum with one of his own that stated: "I accept your reprimand concerning poor volume.... If I can't get things going you won't need to fire me, I'll resign. If I can't be productive for this company, I'll find one I can be successful with."

In May 1990, VEF decided to consolidate two geographically overlapping sales units into one sales force. At that time, Alley met with his newly named regional superior, Otis Farmer, who told Alley that his performance was substandard. Alley admitted to Farmer that his sales quota was fair and that the sales volume report accurately reflected his current sales numbers. In light of these numbers, he even expressed concern to Farmer regarding possible layoffs resulting from the corporate reorganization.

Alley's performance deficiencies did not permit him to keep his promise to quit before being fired. To carry out the corporate plan, Farmer was asked by his superior to recommend two of the sixteen District Marketing Managers for layoff; Farmer, then age 45, was not given any guidelines to make this decision. He determined that the two District Marketing Managers with the lowest "funded sales volume" (by all accounts, the most significant measure of success in VEF) would be recommended for layoff. As one might surmise, Alley, along with Kyle Smith (age 27), was the low man on the totem pole. Alley's poor performance, along with other negatives contained in Alley's personnel file, made it clear to Farmer that Alley must be recommended for layoff. Farmer's superior accepted his recommendations, and both Alley and Smith were laid off.

### B. Schultz's Employment Situation

Hubert Schultz, formerly Transamerica's National Franchise Account Manager, was hired by VEF on December 4, 1989, as a National Account Manager. Randolph Wexler hired Schultz for VEF to provide expertise in fast-food franchising and put Schultz in charge of developing the franchise business, educating VEF salesman to understand and develop the franchise business, and closing business deals with national franchisors whose products VEF would then offer to finance for approved franchisees. Schultz reported directly to David Labrozzi, Manager of the National Accounts Program, who reported to Wexler.

Like Alley, Schultz did not get off on the right foot. At Schultz's very first sales meeting on January 21, 1990, he was to present detailed information on how to market and close transactions in the fast-food franchise industry. It turns out that Schultz simply described his extensive contacts in the industry and told war stories. Wexler was looking for more and told Labrozzi so; Labrozzi

passed Wexler's feedback along to Schultz. At the next scheduled meeting, on February 21, 1990, Schultz was to present to the credit department detailed information to help them understand the franchise business and how to resolve credit issues. Instead, Schultz again "regaled" his audience with stories of his personal contacts; he also failed to answer questions put to him in this meeting.

Understanding that VEF wanted to generate new business in the franchise industry as soon as possible, Schultz sent Labrozzi a memorandum dated February 8, 1990, in which he identified those franchisors that required his immediate attention. Schultz, however, did not submit the necessary information regarding these high priority franchisors to the credit department for about three months. In addition, early in February, Labrozzi requested of Schultz several franchisors' uniform franchise offering circulars; these circulars are prospectuses that a franchisor submits to the marketplace for consideration by potential franchisees and are referenced in the industry by the acronym "UFOC." Labrozzi believed that UFOCs were necessarily evaluated before meeting with a particular franchisor and requested UFOCs of high priority franchisors from Schultz. Schultz stalled on this request, at one time complaining to Labrozzi that UFOCs were not that important, before finally complying with Labrozzi's request at the end of March.

One of these UFOCs that Labrozzi had requested was for Dunkin' Donuts, with which Schultz had scheduled a sales call for March 27, 1990. Wexler, Schultz and three other VEF employees attended this meeting. Wexler felt that Schultz was unprepared, did not understand the business issues, could not answer questions, and "embarrassed the company." Wexler conveyed his feelings to Labrozzi in no uncertain terms.

Over Schultz's first four months with VEF, Labrozzi had communicated to Schultz several times over the phone his displeasure with Schultz's performance with respect to certain issues. By April 1990, Labrozzi had concluded that Schultz had failed to perform certain tasks that Labrozzi considered critical to

VEF's success in that market. Labrozzi met with Wexler to discuss Schultz's problems, and Wexler told Labrozzi to meet with Schultz to discuss his deficiencies. On April 11, 1990, Labrozzi met with Schultz and told him that Schultz: had not submitted important franchisors' files for credit approval; was not "driving the business" (selling aggressively); was not closing enough deals; and was unaccepting (in Labrozzi's estimation) of VEF's credit standards. Schultz responded by complaining that VEF's credit department was deficient and was to blame for Schultz's low business volume. He also blamed the credit department for holding up the closing of the Tony Roma's account, but later admitted to Labrozzi that he had failed to provide information he knew was necessary for approval. Subsequent to this meeting, Schultz did submit information for important franchisors, but not for several weeks after the meeting.

In May, Labrozzi determined that Schultz must be terminated because he was unable or unwilling to improve his performance. Labrozzi informed Wexler of his decision and explained his reasons. Wexler agreed with Labrozzi, but recommended that Labrozzi discuss Schultz's termination with the human resources manager, Walter Conley. Labrozzi did this, explaining to Conley each of Schultz's miscues and Schultz's inability to improve.

Finally, Labrozzi met with Schultz and terminated him for unsatisfactory performance. Labrozzi informed Schultz that he was to be paid through August and could keep his company car through June. Predictably, Schultz was displeased. He complained that he had forfeited severance benefits from Transamerica, demanded a greater severance package from General Electric, and threatened legal action. Labrozzi told Schultz that he would discuss his severance package with the human resources manager, but that he could not give him an employment reference because Schultz was being terminated for poor performance.

Labrozzi met with Conley again to discuss Schultz's severance package. Labrozzi informed Conley that he was terminating Schultz for poor performance, and for that

reason, he could not transfer Schultz to another position within VEF. Conley informed Labrozzi that terminated employees are not entitled to any severance pay or benefits, but that he would explore other options.

Labrozzi and Conley discussed Schultz's situation several times over the telephone over the next several weeks. In early June, Conley had determined that, from an administrative perspective, if VEF characterized Schultz's termination as a layoff, VEF could offer Schultz some termination benefits. As a result, Conley sent Schultz a letter informing him of his termination benefits and characterizing the termination as a layoff. In response, Schultz accepted the benefits, but wrote Labrozzi a letter in which he stated: "It is curious to note that you are now calling my dismissal a 'layoff' when in fact on May 22, 1990, you called it a 'termination' because of performance."

## II. Analysis

We review a district court's grant of summary judgment *de novo* to determine whether the record reveals that there is no genuine issue as to any material fact and General Electric is entitled to a judgment as a matter of law. *See Hartford Accident & Indem. Co. v. Chicago Housing Authority*, 12 F.3d 92, 94–95 (7th Cir.1993). In addition, we view the record and draw all inferences from it in the light most favorable to Schultz and Alley.

Because neither employee has presented any direct evidence that age was the determining factor in their respective discharges, they have relied on the burden-shifting method of proof as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and applied to ADEA cases. *See McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir.1992). The first requirement of this burden-shifting methodology is that the employees must establish a *prima facie* case of age-based discrimination. Here, the district court presumed a *prima facie* case, and General Electric has admitted one.[1] The estab-

lishment of the *prima facie* case creates a rebuttable presumption of discrimination and shifts the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994).

■ If the employer successfully explains its reasons for the termination, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for age discrimination. *Id.* (citing *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 426–27 (7th Cir.1989)). General Electric has offered ample evidence that it terminated these two individuals for performance deficiencies. In Alley's case, it was an inability to close deals. In addition to the report of funded sales volume on which Farmer relied, Alley himself admitted to poor performance. With respect to Schultz, General Electric has offered detailed evidence in the form of deposition testimony by Wexler and Labrozzi, corroborated by Schultz's deposition testimony, that Schultz was a poor performer. With respect to both employees, General Electric has clearly explained the terminations with legitimate, non-discriminatory reasons, and as a consequence, the burden has shifted back to the employees to demonstrate that General Electric's reasons are a pretext.

■ Schultz devotes a great deal of space in his brief to arguing the effect of the Supreme Court's decision in *Saint Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), on our analysis of pretext in the employment discrimination context. We, too, have devoted a great deal of space to that very issue. We did it, however, in another case—the aforementioned *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122–24 (7th Cir.1994). We will not rehash that discussion since we believe that, despite the lapse of a few months, it retains a great deal of its vitality, but we will restate our conclusion: at the summary judgment stage, the non-movants must " 'produce

---

1. General Electric has clearly conceded a *prima facie* case to Schultz. Its position with respect to Alley is less clear. Since, in our view, this case turns on the issue of pretext and because the

result is the same with respect to Alley's claim, we will operate on the presumption that General Electric has conceded a *prima facie* case to Alley.

evidence from which a rational factfinder could infer that the company lied' about its proffered reasons for [the employees'] dismissal." *Id.* at 1124 (quoting *Shager v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990)). Neither Schultz nor Alley has done so.

■ In his attempt to demonstrate pretext, Alley argues that the report on which Farmer relied may not have been the most accurate indicator of performance. In addition, he argues that any performance problems were not his fault, but were caused by inefficiency or incompetence in the credit department. These arguments do not properly address the issue of pretext in this case and, as a result, do not raise a genuine issue of material fact.

■ Alley points to other reports as better indicators of performance, which are not in the record. Even if we accept Alley's characterizations of these reports, his reliance on them to demonstrate that General Electric's reasons for Alley's termination are pretextual misses the point. "There is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994). If Alley's contentions are taken as true, he has offered evidence of the latter, while his burden is to prove the former. These "other" reports may say several things, but what they do not say is that Farmer knew that his reliance on the "funded sales volume" report was invalid. Alley might have been able to meet his burden if he could prove, for example, that Farmer had thought the report to be erroneous or that he believed "funded sales volume" was an irrelevant performance criterion; such evidence would permit a factfinder to find that Farmer lied. But, it is irrelevant that a factfinder may find that Farmer erred in his assessment of Alley's performance. We do not question an employer's good faith business decision. *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1304 (7th Cir.1991).

■ For the same reasons, Alley again misses the mark with his complaint that his problems were not his fault, but the fault of the credit department. Attempts to shift blame are generally not useful in showing pretext. *See Anderson,* 13 F.3d at 1125 (citing *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)). In this case, Alley's allegations of incompetence of others do nothing to demonstrate that General Electric is lying about the reasons for his termination.

Further support for General Electric's position is that there is nothing in the inferiority of the "funded sales volume" report or in the problems within the credit department that implicates age. Remember, Alley is trying to prove age discrimination. The report is completely independent of age; indeed, the report indicated poor performance on behalf of both Alley and Smith, a 27–year–old, who was also terminated. Also, to the extent that the credit department hindered Alley's efforts, it did so with all the other sales representatives. There is nothing in Alley's argument that indicates that General Electric's reasons are indicative of anything other than the legitimate exercise of business judgment.

■ Schultz's attempts to demonstrate pretext are similarly flawed. He admits that he provided UFOC's to Labrozzi long after Labrozzi had initially asked for them. He also admits that he failed to submit the necessary information regarding key franchisors until the end of April and early May. Schultz attempts to demonstrate, however, that Labrozzi lied about his belief that Schultz was a poor performer by explaining his failings at the various meetings. This is not enough; an employee's "own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination." *Billups,* 922 F.2d at 1303 (citing *Weihaupt,* 874 F.2d at 429)). Schultz, then, has presented no evidence indicating that Labrozzi lied about his belief that Schultz was a poor performer, much less evidence that Schultz was anything but a poor performer.

Next, Schultz argues that he has demonstrated pretext by showing that Labrozzi

treated younger employees with performance problems better than he treated Schultz. Around the time of Schultz's termination, there were four other National Account Managers reporting to Labrozzi with performance problems: 1) Jim Welch, age 43, an employee of two and one-half years; 2) Chris Hamer, age 40, also an employee of two and one-half years; 3) Vivian Malcy, age 39, an employee of five years; and 4) Richard Pitlock, age 35, an employee of one and one-half years. Schultz contends that these peers received warnings about their poor performance and probationary periods in which to improve; this, he says, indicates age discrimination and pretext. He is wrong.

First, only Malcy and Hamer received probations; Malcy received a sixty day probation, and Hamer got ninety days. Second, all four were treated identically to Schultz in that each either resigned or was fired for poor performance. Third, even if Schultz's peers were treated slightly differently, their treatment can be explained on the basis of individual characteristics—tenure with the company or experience in the industry, for example. Fourth, Schultz received direction and repeated warnings about his failure to perform; he either was incapable of heeding the warnings or simply ignored them. Nothing in Labrozzi's treatment of other poor performers can be read to evidence age discrimination or demonstrate that Labrozzi's reason for terminating Schultz was a lie.

Schultz's only other argument of note is that the description of his separation from General Electric as a layoff in the letter informing him of severance benefits demonstrates that he was not terminated for poor performance. In effect, Schultz attempts to turn around his good fortune of additional severance and use it as evidence of pretext; this attempt is for naught. General Electric has fully and adequately explained its reasons for describing Schultz's termination in that way. In addition, Schultz admits that Labrozzi told him that he was being terminated for performance deficiencies. There is nothing in the characterization of his termination in this letter that can be construed as evidence of pretext. In raising this argument, we suppose that Schultz is trying to teach General Electric a lesson about going the extra mile to help a terminated employee, especially when that employee was a lousy one.

Finally, the state law claims raised by Schultz and Alley are completely without merit. To recapitulate, then, neither Schultz nor Alley has presented any evidence that would permit a trier of fact to find that General Electric's reason for terminating them, poor performance, is unworthy of credence. Consequently, the district court's order is

AFFIRMED.