51 F.3d 275
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Richard CROSS, Plaintiff-Appellant,
v.
ROADWAY EXPRESS, Defendant-Appellee.
 No. 94-3304.
 United States Court of Appeals, Seventh Circuit.
 Argued March 1, 1995.
Decided March 28, 1995.
 
 Before CUMMINGS, EASTERBROOK, ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Appellant Richard Cross brought an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., and 42 U.S.C. Sec. 1981 against his employer Roadway Express. The district judge granted summary judgment in favor of the employer and Cross appeals. We affirm.
 
 I. BACKGROUND
 
 2
 Richard Cross, a black male, has been employed by Roadway Express ("Roadway") at its Chicago Heights, Illinois facility since July 28, 1984. Cross is employed as a truck driver by Roadway, and his function is driving semi-tractor trailer units loaded with freight between the Chicago Heights terminal and other Roadway terminals.[1] Roadway employs approximately 700 people at the Chicago Heights facility, about half of whom are drivers.
 
 
 3
 Cross' suit challenges several disciplinary actions taken by Roadway against him in the period from May 1991 to May 1992. During this period, Cross received six reprimands for absenteeism, including five warning letters and one three-day suspension.
 
 
 4
 Date Discipline Number of Absences
------- ---------------- --------------------
 In Preceding 60 Days
 ----------------
5/17/91 Warning 6
5/30/91 Warning 12
6/6/91 3-day suspension 14
8/14/91 Warning 8
3/31/92 Warning 2
5/17/92 Warning 12
 
 
 5
 Cross was also disciplined with three other warning letters, two for delay of freight (May 16, 1991, and May 27, 1991), and one for failure to turn in his daily log (July 25, 1991).[2]
 
 
 6
 Roadway has written policies regarding attendance, performance of duties, and discipline. After their required eight hour rest period, drivers must be available to receive a "duty call" (assignment to haul freight). When a duty call is made, the driver will have two hours (typically) to report for work. Failure to be available for a duty call, or failure to report for a duty call that is accepted, is cause for disciplinary action as an "unexcused absence" (absenteeism).
 
 
 7
 Roadway has a system of progressive discipline for absenteeism that is based on the review of absences within rolling 60 day periods. Two unexcused absences[3] within the 60 day period constitutes a "first offense," per Roadway's policies. Both the first offense and second offense (theoretically three actual unexcused absences) are punished with a warning letter. A third offense (four actual absences) warrants a suspension. The fourth offense (five actual absences) prompts another warning letter, and the fifth offense (six actual absences) calls for discharge.[4] Drivers can also be disciplined for "delay of freight" (arriving more than a half hour late to a destination absent extraordinary circumstances such as bad weather) or failing to turn in their daily log book.
 
 
 8
 Warning letters would be issued to an employee who was absent due to illness, unless the illness was substantiated with a doctor's note. (Roadway's 12(M) p 23; Cross' 12(N) p 23). An employee could still be disciplined for an absence due to illness even if substantiated with a doctor's note if the employee was deemed "habitually absent." (Id.)
 
 
 9
 Roadway dispatchers and supervisors were apparently harsh when it came to writing up driver infractions. Typically 10-25 proposed disciplinary letters were submitted to the relay manager, Mike Lamphere, for review and possible issuance during a typical week. It was not uncommon for a driver with significant service time to have received more than a dozen written warnings.
 
 
 10
 Cross claimed that the disciplinary actions by Roadway were racial harassment with the goal of forcing him to quit. Cross did not seriously contest that he engaged in the conduct disciplined, but maintained that he had valid excuses. Cross further claimed that white drivers were treated far more leniently for the same infractions. The district court evaluated the claim using a somewhat compacted McDonnell Douglas analysis, noting that the prima facie case and pretext analysis merged in this case, and focused on whether Roadway's actions were mere pretext. (District Court Opinion at 8-9). The district court granted summary judgment to Roadway, concluding there was no evidence that the discipline was in any way based on race. (District Court Opinion at 16).[5]
 
 II. DISCUSSION
 
 11
 Cross maintains the district court erred in granting summary judgment, as there remain material issues of fact that must be resolved at trial. Cross argues that Roadway discriminated against him by repeatedly disciplining him on account of his race in an effort to drive him out of his job. Cross maintains that he had a valid excuse for each violation of Roadway's rules, and that a white worker (Clay Tucker) was not disciplined for the same infractions. Cross also argues that the discipline imposed was contrary to Roadway's policies and Department of Transportation regulations.[6] Cross further claims that the racial slurs he was subjected to provide further evidence of discrimination. Roadway argues that Cross has presented no evidence of discrimination. Roadway further argues Cross has unsuccessfully "cherry-picked" in his comparison of his record with that of Clay Tucker.
 
 
 12
 This court reviews the granting of summary judgment de novo. Roger v. Yellow Freight Systems, Inc., 21 F.3d 146, 148 (7th Cir.1994). Summary judgment is appropriate when the pleadings, admissions, and affidavits show that there is no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must review the record and draw all reasonable inferences in the light most favorable to the nonmoving party. Roger, 21 F.3d at 148-49. Where the nonmoving party has the burden of proof on a dispositive issue, that party bears the burden of demonstrating a genuine issue for trial on that issue. Id. at 148. A genuine issue for trial exists only if a reasonable jury could find for the nonmoving party based on the record as a whole. Id. at 149.
 
 
 13
 The summary judgment standard is applied with "added vigor in employment discrimination cases, where intent is inevitably the central issue." McCoy v. WGN Continental Broadcasting Co. 957 F.2d 368, 370-371 (7th Cir.1992). See also Kralman v. Illinois Dept. of Veteran's Affairs, 23 F.3d 150, 152 (7th Cir.1994), cert. denied, 115 S.Ct. 359 (1994). However, "[s]ummary judgment will not be defeated simply because motive or intent are involved." Roger, 21 F.3d at 148. Without a prima facie case, a Title VII plaintiff cannot withstand a motion for summary judgment. Hong, 993 F.2d at 1261.
 
 
 14
 Title VII of the Civil Rights Act provides, in relevant portion:
 
 
 15
 It shall be an unlawful employment practice for an employer--
 
 
 16
 (1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ... 42 U.S.C. Sec. 2000 e-2(a).[7]
 
 
 17
 "An employee may establish a prima facie Title VII case by showing that: (1) he belongs to some protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) his employer treated similarly-situated employees outside his classification more favorably." Hughes v. Brown, 20 F.3d 745, 746 (7th Cir.1994) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). An employer may rebut a prima facie case by articulating a legitimate, nondiscriminatory reason for its allegedly biased action. Id. (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)). The employee can challenge the employer's stated reasons as being merely pretext; pretext is established by showing that the employer's reason has no basis in fact, is not the real reason, or is inadequate to support the decision. Id. at 747. If the employee does not have an exemplary employment record, he must show that "although he was not a good employee, equally bad employees were treated more leniently by [employer] if they happened not to be black." Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir.1993), cert. denied, 114 S.Ct. 1648 (1994).
 
 
 18
 The only issue actively disputed by the parties is whether Cross was treated differently than the white drivers, which is essentially tied to whether Roadway's reasons for disciplining Cross were mere pretexts. A review of the record indicates Cross has failed to establish a prima facie case because he has not shown white drivers were treated any differently than he was.
 
 
 19
 Cross makes several arguments why Roadway's disciplinary actions against him for absenteeism and delay of freight were wrongful.[8] As to absenteeism, Cross argues that he had valid excuses for being absent, including being ill, being injured, being required to handle union business, and being required to take his father to the hospital. Cross claims a Roadway supervisor stated no worker would be disciplined for taking his father to the hospital. Cross further argues that disciplining him for taking himself out of service due to illness was contrary to Roadway's policies and Department of Transportation regulations, which forbid a driver from operating a vehicle while impaired.
 
 
 20
 Cross does not dispute he missed the days Roadway claims he missed, nor does he claim that he utilized his designated sick days to render the absences excused. Cross simply argues that Roadway's policies were harshly and erroneously applied to him, given his valid excuses. An employer does not violate Title VII by merely being mistaken or harsh, "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and Sec. 1981 do not interfere." Pollard v. Rea Magnet Wire Co., Inc., 824 F.2d 557, 560 (7th Cir.1987), cert. denied, 484 U.S. 977 (1987). "An employer's decision does not have to be wise, prudent, or logical; it merely has to be explained clearly and applied indiscriminately." Bruno v. City of Crown Point, Ind., 950 F.2d 355, 364 (7th Cir.1991), cert. denied, 112 S.Ct. 2998 (1992). See also Kralman, 23 F.3d at 156 (the courts do not sit as super-personnel departments reevaluating business decisions that might be mistakes or exercises in poor business judgment).[9]
 
 
 21
 That Roadway would not accept Cross' excuses is not in itself relevant, unless Roadway would accept similar excuses from white workers. Unless race mattered in the decisions, Cross is not entitled to relief. See Pollard 824 F.2d at 560-61. Cross' questionable evidence that this was the case is not sufficient to create a genuine issue of material fact which precludes summary judgment.
 
 
 22
 First, Cross argues that a supervisor, Debra Halsted, stated that no employee would be disciplined for taking his father to the hospital. (Cross' 12(N) paragraphs 2A, 3A). An examination of Halsted's deposition indicates otherwise. Ms. Halsted stated drivers were automatically disciplined for absences, unless the relay manager decided exceptional circumstances existed. (Halsted Dep. at 54-55).[10] Ms. Halsted indicated an illness in the family could be a possible exceptional circumstance, particularly if the driver's attendance record was "excellent." (Id. at 55).[11] Lamphere, the relay manager, did not view Cross' attendance record as "excellent," but instead regarded him as habitually absent. (Roadway's 12(M) p 40; Cross' 12(N) p 40).
 
 
 23
 As to the absences due to illness, Lamphere, per the Roadway procedures, disregarded doctor's notes for employees that were habitually absent. (Roadway's 12(M) p 23; Cross' 12(N) p 23). Cross conceded in his deposition that he was aware of no employee who was deemed habitually absent who did not receive written warnings when they took themselves out of service. (Cross Dep. at 142). That his absences may not have been culpable is irrelevant; "a worker who for whatever reason does not show up for work regularly is not a satisfactory employee." See Bush, 990 F.2d at 931.
 
 
 24
 Cross' argument that disciplining drivers for taking themselves out of service when impaired runs counter to Roadway policy and Department of Transportation regulations is unpersuasive. Adequate provision is made for illnesses, given the availability of worker's compensation leaves, personal sick leaves, and five sick days. (Roadway's 12(M) p 20; Cross' 12(N) p 20). The record indicates Cross was aware of and often took advantage of these procedures.
 
 
 25
 Most significantly, Cross argues he was treated more harshly than a similarly-situated white male, Clay Tucker. Roadway challenges this argument on two bases. First, because Roadway employs approximately 350 drivers, Roadway maintains Cross has engaged in "cherry-picking," which is contrary to the teaching of Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir.1993). In Bush, this court held that:
 
 
 26
 "A plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than he, though other coworkers of his race were treated more favorably than other coworkers of other races."
 
 
 27
 990 F.2 at 931.[12] Unlike the employer in Bush, however, Roadway has not submitted any evidence of black employees being treated more favorably than similarly-situated white employees.
 
 
 28
 Roadway's second argument, that Tucker was not treated more favorably than Cross, is persuasive. First, while Clay Tucker was hired at approximately the same time as Cross, Tucker has been disciplined approximately twice as many times in the course of his career (35 verses 17). (Roadway's 12(M) paragraphs 137, 138; Cross' 12(N) paragraphs 137, 138). Second, Tucker has been disciplined 16 times for absenteeism, including a three-day suspension. (Roadway's 12(M) p 140; Cross' 12(N) p 140).
 
 
 29
 Cross argues that Tucker stated he was never disciplined for any injury and never heard of drivers being disciplined for taking themselves out of service due to illness or fatigue, a stark contrast to Cross' treatment. (Cross' 12(N) p 11A). An examination of Tucker's statements, however, does not bear this contention out.
 
 
 30
 Tucker described three serious injuries for which he missed considerable time (approximately three months per injury). (Tucker Dep. at 12-15). Cross has conceded these periods were medical leaves of absence. That Tucker was not disciplined while on medical leave is irrelevant, as Cross was not disciplined on any occasion he was on medical leave.
 
 
 31
 Further, Tucker stated that when he called in sick he was disciplined the majority of the time. (Tucker Dep. at 29. See also Roadway's 12(M) p 140; Cross' 12(N) p 140). This result is identical to what happened to Cross when he called in sick or missed a day for some other reason. Cross actually appears to have fared better than Tucker. Tucker stated he was disciplined the majority of the time he called in sick, while Cross was apparently disciplined less than half the times he could have been.[13] There is no evidence white workers' absenteeism was treated any more leniently than Cross' absenteeism.
 
 
 32
 As to the discipline for delay of freight, Cross argues that he was late because he had to do a required vehicle inspection which took 35 minutes. Cross argues that vehicle inspections have no set time and that a Roadway supervisor stated no one had ever been disciplined for anything involving a vehicle inspection.
 
 
 33
 While the parties do dispute the appropriate time for a vehicle inspection, and whether Roadway has ever given drivers "guidance" as to how long such an inspection should take,[14] these matters are largely irrelevant. Cross was not disciplined for inspecting his vehicle, he was disciplined for arriving late. Cross has presented no evidence that any white driver avoided discipline for arriving late with a similar excuse.
 
 
 34
 Lastly, Cross claims he was subjected to racial slurs and other slights. Cross recounts three instances:
 
 
 35
 1) Cross claims he asked to borrow a terminal manager's raincoat. The manager claimed he did not have one, but moments later offered one to a white driver. (Cross' 12(N) paragraphs 100, 101; Roadway's 12(M) paragraphs 100, 101.)
 
 
 36
 2) Cross heard someone in the driver's room at Roadway use the word "nigger." (Cross' 12(N) p 127; Roadway's 12(M) p 127.)
 
 
 37
 3) Cross was told on one occasion by dispatcher Don Soich, when asking about long freight runs, that the only long thing Soich had for Cross was his "long white dick." (Cross' 12(N) p 126; Roadway 12(M) p 126).
 
 
 38
 Racial slurs are reprehensible and have no place in the workplace. Lenoir v. Roll Coater, Inc. 13 F.3d 1130, 1133 (7th Cir.1994). However, evidence of a supervisor's occasional or sporadic use of slurs directed to an employee's race is generally not enough to support a claim under Title VII, absent a showing the remarks related to the making of the challenged employment decision. Hong, 993 F.2d at 1266. One or two truly isolated slurs do not give rise to an actionable claim under Title VII or Sec. 1981. North v. Madison Area Ass'n. for Retarded Citizens--Developmental Ctrs. Corp., 844 F.2d 401, 408-409 (7th Cir.1988) (2 or 3 statements over 10 years).
 
 
 39
 There is no doubt the slurs were isolated, as Cross concedes there were no others. (Cross' 12(N) p 129; Roadway's 12(M) p 129).[15] Further, Cross concedes he does not know who made the racial slur in the driver's room. (Cross' 12(N) p 128; Roadway's 12(M) p 128). In addition, dispatcher Don Soich had no input in any of the disciplinary actions at issue in this case. (Cross' 12(N) paragraphs 124, 125; Roadway's 12(M) paragraphs 124, 125). Lastly, Cross concedes that the terminal manager had a lengthy association with the white driver to whom he lent the raincoat, which was not the case with Cross, and that Cross had just arrived late with a load when the incident occurred. (Cross' 12(N) paragraphs 93, 102; Roadway's 12(M) paragraphs 93, 102).
 
 III. CONCLUSION
 
 40
 As Cross has not established any basis for concluding the disciplinary actions were taken because of Cross' race, the district court is AFFIRMED.
 
 
 
 [1]
 Cross has been on personal medical leave from his job since May 27, 1992
 
 
 [2]
 Cross' work record is somewhat unusual. From the date of hire to the present, approximately ten and a half years, Cross has missed over six and one half years of work time due to worker's compensation leaves and personal sick leaves. None of the disciplinary actions disputed in this case are related to these leaves
 
 
 [3]
 Drivers are eligible for worker's compensation leaves of absence and personal medical leaves of absence if they become disabled for a significant period. Drivers are also permitted five sick days a year. An absence will not be deemed unexcused if the employee is on leave or utilizes a sick day
 
 
 [4]
 As noted by the district court, the language in the Roadway guide is somewhat murky. To be discharged, the employee must apparently commit 5 offenses in a given 60 day period
 
 
 [5]
 The district court further concluded that almost all of Roadway's conduct could not be challenged under Sec. 1981, as it occurred prior to the effective date (11/21/91) of the Civil Rights Act of 1991. See generally Rivers v. Roadway Express, Inc., 114 S.Ct. 1510 (1994). As for the two disciplinary acts subsequent to the effective date of the act, the district court concluded they were subject to the same burden of proof and production under Sec. 1981 as the disparate treatment claims under Title VII. See Hong v. Children's Memorial Hospital, 993 F.2d 1257, 1266 n. 7 (7th Cir.1993), cert. denied, 114 S.Ct. 1372 (1994), and pet. reh. den., 114 S.Ct. 2695 (1994). Cross has not contested either of these conclusions on appeal
 
 
 [6]
 Cross also argued below that Roadway had discriminated against other blacks and had a policy of firing blacks and replacing them with whites. These arguments have not been pursued on appeal. The evidence indicates that the percentage of black workers at Roadway has been relatively constant over time. (Roadway's 12(M) p 7; Cross' 12(N) p 7)
 
 
 [7]
 Section 1981 provides:
 "All persons within the jurisdiction of the United States shall have the same right in every State or Territory to make and enforce contacts ... 42 U.S.C. Sec. 1981.
 The analysis under Title VII and Sec. 1981 is functionally equivalent. Hong, 993 F.2d at 1266 n. 7.
 
 
 [8]
 Cross makes no arguments on appeal related to the disciplinary action for failing to turn in a log book
 
 
 [9]
 The correctness or incorrectness of the employer's decision is of limited relevance to both establishing a prima facie case or showing pretext. Cross argues that because the disciplinary decisions were allegedly "wrong," they indicate racial animus. An employer's decision will not be deemed pretext merely because it is wrong. Schultz v. General Electric Capital Corp., 37 F.3d 329, 334 (7th Cir.1994). From a prima facie case perspective, that an employer's decision is "wrong" would only seem relevant if such decisions are not equally "wrong" when made regarding white employees. Generally, an employer may make an adverse employment decision for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Bruno 950 F.2d at 364 (quoting Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984))
 
 
 [10]
 A doctor's excuse is not an automatic exoneration for an absence. (Lamphere Dep. at 75-76)
 
 
 [11]
 While the excerpt is incomplete, Ms. Halsted seems to state such exceptions were made for all drivers, regardless of race. (Halsted Dep. at 55, line 24.)
 
 
 [12]
 Cross also argues that Roadway's interpretation of Bush, that a plaintiff must show a statistically significant difference in treatment, would create an impossible hurdle for Title VII plaintiffs. Subsequent to Bush, this court has held a plaintiff must present evidence that other employees similarly situated to the plaintiff received "systematically better treatment," but that the evidence need not be "rigorously statistical." See Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir.1994)
 
 
 [13]
 The summary chart presented earlier shows Cross had a total of 6 disciplinary actions taken for absenteeism, with an average of 9 unexcused absences in the 60 day period proceeding each disciplinary action. A driver could be disciplined after two unexcused absences in any 60 day period
 
 
 [14]
 See Cross' 12(N) Statement paragraphs 98, 16A; Roadway's 12(M) p 98; Roadway's Supplemental 12(M) p 16A
 
 
 [15]
 Judge Shadur found the paucity of slurs in itself somewhat remarkable, given the trucking industry's reputation for rough language. (District Court Opinion at 15)