Eleesa M. O'HARA, Plaintiff,

v.

SAINT FRANCIS HOSPITAL, INC., Defendant.

No. 94–CV–664–H.

United States District Court, N.D. Oklahoma.

Nov. 13, 1995.

Gomer A. Evans, Jr., Randall K. Gause, Tulsa, OK, for Eleesa M. O'Hara.

Larry D. Henry, Patrick W. Cipolla, Arrington Kihle Gaberino & Dunn, Tulsa, OK, for Saint Francis Hospital, Inc.

## ORDER

HOLMES, District Judge.

This matter comes before the Court on a Motion for Summary Judgment by Defendant Saint Francis Hospital, Inc. ("Saint Francis" or the "hospital").

Plaintiff Eleesa M. O'Hara ("O'Hara") commenced this action on July 5, 1994 claiming that her former employer, Saint Francis, discriminated against her because she was pregnant. O'Hara claims that Saint Francis discharged her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). On April 28, 1995, Defendant moved for summary judgment on the grounds that it released O'Hara for incompetence and unsafe patient care, and not because she was pregnant.

Summary judgment is appropriate where "there is no genuine issue as to any material fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Insurance Corp.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), and "the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). In *Celotex,* the Supreme Court stated:

[t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. at 2552.

A party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts, Fed.R.Civ.P. 56(e), sufficient to raise a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment") (emphasis in original). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510.

Summary judgment is only appropriate if "there is [not] sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250, 106 S.Ct. at 2511. The Supreme Court stated:

[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512. Thus, to defeat a summary judgment motion, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [citation omitted]. If the evidence is merely colorable, [citation omitted], or is not significantly probative, summary judgment may be granted.").

In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Boren v. Southwestern Bell Tel. Co.,* 933 F.2d 891, 892 (10th Cir.1991).

Title VII prohibits an employer from discharging or otherwise discriminating against an employee because of his or her gender. 42 U.S.C. § 2000e–2(a) (1988). It is elemental that bias against a woman because she is pregnant constitutes gender-based discrimination. 42 U.S.C. § 2000e(k) (1988) (Pregnancy Discrimination Act of 1978). Because O'Hara is unable to produce any direct evidence of discrimination, to establish a *prima facie* case of gender discrimination, she

must prove (1) that she was pregnant, (2) that she was qualified for the position of registered nurse in the post anesthesia care unit (the "PACU") at Saint Francis, (3) that she was discharged, and (4) that the position remained open or was filled by another person. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Plaintiff's establishment of a *prima facie* case creates a presumption of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

▉▉▉ Defendant then has the burden of producing evidence that it discharged her "for a legitimate, nondiscriminatory reason." *Id.* at 254, 101 S.Ct. at 1094. Defendant's burden is solely one of production: Saint Francis "is not required to persuade [the Court] that it actually was motivated by the asserted reason." *Equal Employment Opportunity Comm'n v. Ackerman, Hood & McQueen, Inc.*, 758 F.Supp. 1440, 1452 (W.D.Okla.1991), *aff'd*, 956 F.2d 944 (10th Cir.), *cert. denied*, 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). If Saint Francis satisfies its burden, the presumption of discrimination created by Plaintiff's *prima facie* case is eliminated. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95.

▉▉▉ Ultimately, to prevail on her claim, Plaintiff must demonstrate "that the proffered reason was not the true reason for the employment decision," *id.* at 256, 101 S.Ct. at 1095, and that her pregnancy was. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). At all times, Plaintiff retains the "ultimate burden of persuading the [trier of fact] that [she] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The Court reviews the following uncontroverted facts against this legal framework. O'Hara was associated with Saint Francis as an employee and volunteer worker for approximately ten years. On May 18, 1992, she began working as a novice registered nurse in the PACU.[1] At that time, Saint Francis required novice registered nurses working in the PACU to complete a three month intensive orientation program before working in the unit on their own. As a part of orientation, each new registered nurse is assigned a preceptor. A preceptor is an experienced PACU nurse who assists the new registered nurse during the orientation program.

Barbara Hannah ("Hannah"), clinical manager of the PACU when O'Hara worked there, hired O'Hara and three other novice registered nurses, Deborah Feamster ("Feamster"), Deawn Proo ("Proo"), and Danna Bramwell ("Bramwell") to work in the PACU.[2] Two other nurses, JoAnn Schultz ("Schultz") and Angela Wagstaff ("Wagstaff"), were also hired to work there in May and June 1992, respectively. During O'Hara's employment in the PACU, Hannah was responsible for the day to day operations of the unit including the supervision of all PACU nurses. Although Schultz and Wagstaff had prior registered nurse experience, each was required to complete the PACU orientation successfully. Wagstaff was originally scheduled for a shorter orientation program, but she requested that her orientation be extended.

At the end of the first orientation program, O'Hara met with Hannah, Marti Duszynski ("Duszynski"), one of O'Hara's preceptors, and Maria Cox ("Cox"),[3] clinical instructor of the PACU orientation program. The preceptorship conference record dated August 15, 1992 and signed by O'Hara, Cox, and Hannah contains positive comments and

---

1. The PACU is a critical care unit which provides care for patients who have just undergone surgery.

2. O'Hara was *not* pregnant when she was hired. In contrast, when Feamster was hired, she was pregnant, and this fact was known by Hannah before Feamster began work. In August 1992, Feamster requested a six week maternity leave of absence, which request was approved by Hannah

and Denise Geuder ("Geuder"), Hannah's superior and Director of Surgery Services. After her maternity leave expired on October 19, 1992, Feamster returned to her nursing duties in the PACU.

3. Cox requested maternity leave in December 1994 and thereafter returned to her nursing duties in the PACU.

identifies certain problems. The positive comments included the following: "Eleesa has positive attitude and has done well on all required tests, i.e. Dysrhythmia test, Hemodynamic tests and classes in the PACU during orientation." The record identified the following problems:

Eleesa having trouble with transition from SNA [student nursing assistant] to RN [registered nurse]. Doesn't seem to apply what she has learned to patient care. Doesn't ask questions. Doesn't stay at bedside or tell others when she is leaving. (All this reported by preceptor)

O'Hara admits that her skill level was not where it should have been at the end of the initial orientation period in August 1992. She attributes her unsatisfactory skill level to "inconsistent training" resulting from the fact that she was assigned several different preceptors.[4] The record also contained a "plan of action":

Upon further questioning, Eleesa felt uncomfortable asking questions of preceptor and was somewhat intimidated by her. This was felt to be hindering the learning process so preceptor was changed and will now consist of Maria Cox (Instructor) 2 days per week and either E. Fleetwood, or J. Krajicek the other three days per week. Eleesa was given 4 weeks to meet orientation criteria and prove that she can adequately perform care of PACU patients. She will be evaluated by preceptors weekly.

Saint Francis permitted Feamster, Proo, Bramwell, Schultz, and Wagstaff to begin working on shifts independently at the end of their initial orientation periods.

On September 18, 1992, O'Hara met again with Hannah, Cox, and, additionally, Fleetwood for an "End of Orientation conference to determine readiness to go on shift." The second preceptorship conference record listed the following positive comments:

Eleesa much more confident and competent than previous conference. She has been studying and learning more about each surgery, hemodynamics and areas where she had weaknesses. Preceptor, orientee and instructor feel she is ready to start shift on her own.

The record also enumerated suggestions from preceptor and instructor:

1. Be aggressive when checking in patients. Don't let others get in your way and do things for you. 2. Will need support with ICU patients. 3. Ask questions about *anything* you have a concern about. Don't let yourself get into trouble. 4. Continue to study specific surgeries and how they are done, particularly anatomy/physio. involved. (emphasis in original)

Finally, the record contained a "plan of action":

Eleesa will start on 10–6:30 shift where she will have more help available to her if needed and will be able to take sicker patients in order to gain more experience without feeling like she is "totally" alone.

Feamster, Proo, Bramwell, and Wagstaff were all placed on the 3:00 p.m. to 11:00 p.m. shift when they completed orientation. According to Cox, who was the clinical instructor for the PACU orientation program, nurses on this shift necessarily must be more independent because there are fewer nurses available on this shift to help out with problems.

Hannah gave O'Hara, Feamster, Proo, Bramwell, and Schultz their first written performance evaluation as registered nurses in the PACU in November 1992. Hannah gave Feamster 33 points,[5] Schultz 32 points, Proo 30 points, O'Hara 30 points, and Bramwell 28 points. These point totals placed each nurse

---

4. O'Hara's first preceptor, Diane Miller ("Miller") was frequently ill so O'Hara received a second preceptor, Mary Jane Kornblatt ("Kornblatt"). On July 2, 1992, Kornblatt requested a six week maternity leave of absence, which request was approved by Hannah and Geuder. After her maternity leave expired on August 17, 1992, Kornblatt returned to her nursing duties in the PACU. Upon Kornblatt's departure for ma-

ternity leave in July 1992, O'Hara received her third preceptor, Duszynski.

5. Feamster, who received the highest point total from Hannah, had just returned from maternity leave of absence approximately one month prior to the evaluation.

in the "meets and may exceed" expectation category. In the section for comments summarizing overall performance of O'Hara's evaluation, Hannah stated:

> Eleesa is a dependable, caring and highly motivated professional nurse. She demonstrates enthusiasm with each opportunity that comes her way and she is improving daily and enhancing her level of competency as she gains in experience as a new RN in PACU. Her smile is delightful and her zeal to learn everything about patient care in PACU refreshing.

Although her review was favorable and noted improvement, Hannah testified in her deposition that O'Hara failed to progress further from asking questions to working independently and applying her training to patient situations. In December 1992, O'Hara announced her pregnancy.[6]

Beginning in early 1993, O'Hara received five write-ups as a result of patient care incidents. These write-ups ultimately led to her discharge. The following summary of the five incidents is based on the uncontroverted affidavits and deposition testimony of Hannah, Debbie Liebig, Duszynski, O'Hara, Cox, Jenetta Phillippe, Joyce Krajicek, Geuder, and Lee Gutierrez:

1. On January 20, 1993, Hannah documented that O'Hara slowed down the irrigation rate on a patient's prostate/bladder after surgery in contravention of a doctor's order. Another PACU nurse had to unclog the blood from the irrigation line and reset the flow. This incident took place two to three weeks prior to the date it was reported.

2. On February 1, 1993, O'Hara's patient experienced respiratory distress and two PACU nurses, two anesthesiologists, and a respiratory therapist intervened to prevent cardiac arrest.

3. On March 17, 1993, another PACU nurse stopped O'Hara from rapidly injecting the drug Lanoxin into a patient's IV line. A rapid injection of Lanoxin would have caused the patient's heart to stop. Further, the same IV line was being utilized to administer the drug Ancef. Mixing Lanoxin and Ancef in the same IV line would have caused these two incompatible drugs to crystallize and form poisons.

4. On March 24, 1993, another PACU nurse stopped O'Hara from administering a morphine IV to a patient in distress whose blood pressure was dropping rapidly. Morphine would have caused this patient's blood pressure to drop even further. During this incident, O'Hara lost her composure and left the unit.

5. On April 8, 1993, O'Hara released a patient for discharge after outpatient surgery with a hematoma in the abdominal area which measured 8″ by 4½″ and was raised, hardened, and discolored.

After the incident on March 17, O'Hara was placed on probation for a thirty day period.

On March 23, without warning, Hannah required O'Hara to take the PACU yearly certification test. No other nurse was required to take the test at that time. Hannah has testified that she intended to utilize the test as a skills assessment tool. On March 28, 1993, O'Hara filed a complaint of employment discrimination against Saint Francis with the Human Rights Commission for the State of Oklahoma, which agency forwarded the complaint to the Equal Employment Opportunity Commission, ("EEOC"). O'Hara received a notice of right to sue from the EEOC on April 6, 1994.

After the April 8 incident, Geuder met with Robert J. Ligouri ("Ligouri"), director of human resources at Saint Francis, to discuss O'Hara's future employment at the hospital. Geuder recommended terminating O'Hara for incompetence. Ligouri concurred. Neither Geuder nor Ligouri were aware that O'Hara was pregnant. Subsequently, Geuder met with O'Hara and suspended her. She gave O'Hara until April 16, 1993 to seek another position in the hospital or be terminated. On April 16, Saint Francis terminated O'Hara's employment.

▮▮▮ The burden of establishing a *prima facie* case is not onerous, *Burdine*, 450

---

6. On January 4, 1993, Kornblatt requested a second maternity leave of absence for eight weeks to adopt her second baby, which request was approved by Hannah and Geuder. After her maternity leave expired on April 5, 1993, Kornblatt returned to her nursing duties in the PACU.

U.S. at 253, 101 S.Ct. at 1093, and O'Hara's evidence is sufficient to meet this threshold requirement. She has established (1) that she was pregnant when she was discharged, (2) that she was initially qualified to be a registered nurse in the PACU,[7] and (3) that her employment was terminated. O'Hara has not established the fourth prong, that the position remained open or the job was filled by another person. However, Plaintiff may establish her *prima facie* case without proof of this final element. *See, e.g., Equal Employment Opportunity Comm'n*, 758 F.Supp. at 1451–52.

To rebut Plaintiff's *prima facie* case, Defendant has produced evidence asserting that O'Hara was released because she was incompetent, she lacked registered nurse skills which were essential to her work in the PACU, and she posed a threat to patient care and safety. Inadequate patient care is a legitimate, nondiscriminatory reason for firing a nurse. *See, e.g., Wright v. Bethany Hosp.*, No. 89 C 9457, 1991 Westlaw 18175 at *2 (N.D.Ill. Feb. 11, 1991). Further, in her deposition, Plaintiff admitted that the hospital had a good faith belief that she engaged in unsafe patient care. The Court holds that Defendant has met its burden of production.

To defeat Defendant's motion, Plaintiff must "present evidence establishing a reasonable inference [that] the employer's proffered, nondiscriminatory explanation is pretextual." *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 897 (10th Cir.1994); *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir.1993) (insufficient for Plaintiff merely to establish a *prima facie* case to survive summary judgment motion). "Merely showing that the reason articulated by the employer is wrong or unreasonable will not suffice." *Kendall v. Watkins*, 998 F.2d 848, 851 (10th Cir.1993), *cert. denied sub nom. Kendall v. O'Leary,* — U.S. —, 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994); *St. Mary's Honor Ctr.*, 509 U.S. at

510–11, 113 S.Ct. at 2749; *e.g., Schultz v. General Elec. Capital Corp.*, 37 F.3d 329, 333–34 (7th Cir.1994) (at the summary judgment stage, the non-movant must produce "evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [the employee's] dismissal"), *cert. denied sub nom. Alley v. General Elec. Capital Corp.*, — U.S. —, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).

The question for the Court to resolve is whether "facts relating to the pretextuality of [Saint Francis'] action remain in dispute". *Hooks*, 997 F.2d at 798. Plaintiff does not contest that the events described in the write-ups occurred. However, she denies that the hospital has accurately characterized these incidents. Defendant bases its rendition of the events on the deposition testimony of Hannah and O'Hara and on affidavits from seven registered nurses who worked with O'Hara. Plaintiff attempts to controvert Defendant's statement of the events with her own deposition testimony, an interoffice memo she drafted for her personnel file in response to her meeting with Hannah on March 22, 1993, and a letter from O'Hara to Martin Kelsey, Chairman of the Administrative Review Committee on April 20, 1993, requesting an in-house investigation of her termination.

Plaintiff has not produced testimony disputing the hospital's statement of facts from any witness other than herself. Under the circumstances presented by this case, Plaintiff's self-serving testimony containing conclusory allegations without specific supporting facts lacks probative value. *See Thomas v. Int'l Business Machs.*, 48 F.3d 478, 485 (10th Cir.1995). Further, Plaintiff does not allege any direct evidence of discrimination. Instead, O'Hara asserts that the circumstantial evidence establishes that the hospital intended to discriminate against her.

At least three types of circumstantial evidence exist. One type is "suspicious

7. For purposes of evaluating a Plaintiff's *prima facie* case, the Court should only consider employee qualifications that may be measured objectively. *Equal Employment Opportunity Comm'n*, 758 F.Supp. at 1451. Here, Plaintiff's November 1992 evaluation placing her in the "meets or exceeds" category for her position is objective evidence demonstrating that she was qualified to begin work as a registered nurse in the PACU.

timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). The second type consists of evidence that similarly situated employees received systematically better treatment. *Id.* The third is evidence that the plaintiff was qualified for the job in question, that the plaintiff was replaced by a person not having the forbidden characteristic, and that the employer's stated reason for the difference in treatment is unworthy of belief. *Id.*

Here, O'Hara did not present any circumstantial evidence of the second or third type—either comparative or pretext. She did not identify any similarly situated employees who received write-ups for insufficient patient care and were disciplined differently than she was.[8] Because of the write-ups, the occurrence and circumstances of which the Court accepts as true, she cannot show that she meets the hospital's requirements for the job and thus raise an inference of pretext.

To controvert the inference that Plaintiff was fired because she was incompetent, Plaintiff has three facts to offer. The first is her favorable November 1992 evaluation which placed her in the "meets and may exceed" category. At that point in her career as a PACU nurse, she had completed the initial training course and an additional session. After O'Hara had some difficulty completing the orientation requirements, her supervisor determined that she was ready to begin shift work, upon the condition that she was placed on a shift where help would be available. This evaluation occurred some five months prior to her termination, and two months prior to the first patient care incident leading to a write-up. The interposition of the patient care write-ups between the November evaluation and the April termination render the November evaluation not probative of Plaintiff's job performance *after* she was placed on shift work and given independent patient care responsibilities. Under these circumstances, this evaluation does not demonstrate that the hospital intended to discriminate against her.

The second fact asserted by O'Hara is the timing of the write-ups—beginning approximately one month after she announced her pregnancy. While it is true that, under certain circumstances, suspicious timing may assist a plaintiff in making out her *prima facie* case, under the circumstances presented by this case, timing alone is not enough to implicate discriminatory intent—especially because the circumstances of the patient care episodes leading to the write-ups are well-documented by many witnesses. *See Troupe*, 20 F.3d at 737–38 (pregnant employee's discharge one day prior to maternity leave did not preclude summary judgment).

Finally, Plaintiff claims that the test she was required to take in March is evidence that the hospital was discriminating against her. She asserts that the other nurses in her unit were not required to take the test at that time without any warning. However, the Court finds the hospital's explanation for the pop test entirely credible. Plaintiff's supervisor asserts that she intended to use the results of the test for diagnostic purposes. Further, Plaintiff was terminated before her supervisor had reviewed the results of the test.

Reviewing the record as a whole, Plaintiff has failed to meet her burden of proving discriminatory intent. The record does not contain evidence from which a rational trier of fact could reasonably infer that the hospital fired O'Hara because she was pregnant.[9] Therefore, summary judgment

---

8. In fact, the evidence demonstrates that there were other pregnant nurses in Plaintiff's training class, that their pregnancy was known by Plaintiff's supervisor, that they took maternity leave, and that they returned to work without incident. Thus, the only other "similarly situated" evidence weighs heavily in favor of the hospital.

9. The Court notes further that the decisionmakers in O'Hara's termination have testified that they were unaware that she was pregnant when they decided to fire her. Additionally, Plaintiff has not adduced evidence of any remarks or inappropriate stray comments about her pregnancy. Instead, the record is replete with indi-

on behalf of Saint Francis is appropriate. The Court hereby grants Defendant's Motion for Summary Judgment (Docket # 8).

IT IS SO ORDERED.

cations that the PACU welcomed pregnancy among employees and gladly participated in

baby showers.